814 P.2d 917

CLEMENTS FARMS, INC.,
Plaintiff-Respondent,

v.

BEN FISH & SON, and Paul L.
Dompe, Defendants-Appellants,

and

Shields of Idaho, Inc.; Reed Grain &
Bean Co.; and John Does I through
V, Defendants.

No. 19047.

Supreme Court of Idaho,
Caldwell March 1991 Term.

June 14, 1991.

Gigray, Miller & Downen, Caldwell, for defendants-appellants. Donald E. Downen argued.

Eberle, Berlin, Kading, Turnbow & McKlveen, Boise, for plaintiff-respondent. Stephen A. Bradbury argued.

BAKES, Chief Justice.

Plaintiff respondent Clements Farms, Inc. (Clements) planted a crop of lima beans, with seeds which had been acquired from Shields Seed Company (Shields), a seed warehouse in Nampa, Idaho, who had purchased them from defendant appellant Ben Fish & Son (Ben Fish). The crop failed to mature before the growing season ended, and thereafter Clements brought this action against Shields and Ben Fish alleging breach of implied warranty of fitness for a particular purpose. The trial court found that Ben Fish had breached an implied warranty of fitness and rendered judgment in favor of Clements against Ben Fish. Ben Fish appealed this ruling to the Court of Appeals, which affirmed the decision of the district court. We granted Ben Fish's petition for review of the opinion of the Court of Appeals.

The issues in this case are framed by a series of transactions involving Ben Fish, a California seed producer; Clements, a Canyon County farmer; and Shields, a seed warehouse. The seed producer, Ben Fish, is a California enterprise which has developed numerous strains of proprietary lima bean seed to meet various agricultural needs. In order to test its products in differing climates, Ben Fish distributed its seed through warehouses in various parts of the country. Prior to 1985, Ben Fish sold one of its bean seed strains, known as GBL 8–78, to Shields for test growing in Idaho. Those prior seed crops had matured. Shields contracted with Clements to grow a lima bean seed crop from the GBL 8–78 seed. This crop did not mature. The following chronology describes the events leading up to this lawsuit.

On March 6, 1985, Clements entered into a contract with Shields, entitled "Contract for the Growing of Commercial Beans," in which Clements agreed to plant 9600 pounds of G–78 baby lima bean seed "as the bailee of said seeds," and to plant those seeds on a particular 80 acres described in the contract, and to care for the crop, harvest the same, and to deliver back to Shields the harvested product which would meet certain conditions concerning quality, etc. Clements was to be paid $21.00 per hundredweight for those beans which met the contract standards. The contract provided that "title and ownership of said beans to be grown under this contract shall at all times remain with Shields...." The contract was a typical bailment/seed contract similar to contracts which this Court has had occasion to consider in the past. *See Washburn Wilson Seed Co. v. Alexie,* 54 Idaho 727, 35 P.2d 990 (1934); *Smith v. Washburn Wilson Seed Co.,* 40 Idaho 191, 232 P. 574 (1925); *Thiel v. Pacific Fruit & Produce Co.,* 51 Idaho 145, 4 P.2d 356 (1931); *Peterson v. Conida Warehouses, Inc.,* 98 Idaho 883, 575 P.2d 481 (1978); *Chapman v. Haney Seed Co., Inc.,* 102 Idaho 26, 624 P.2d 408 (1981).

The contract further provided that responsibility for any crop failure was Clements', and in the event of such failure Clements would pay Shields $37.00 per hundredweight for the seed stock furnished. The contract further contained a disclaimer by Shields of any warranties, express or implied, concerning the seeds furnished pursuant to the bailment contract.

Pursuant to that bailment contract, Shields delivered the seed to Clements on May 8, 1985. However, before the seed had been planted, Clements learned that Shields was in financial difficulty. Discussions ensued between Clements and Shields over whether Shields would be financially able to purchase the harvested crop in the fall. When these discussions did not satisfy Clements' concerns, it communicated directly with Ben Fish, the seed producer in California, exploring the possibility of a direct purchase agreement between Clem-

ents and Ben Fish that would avoid any risk of a future default by the Shields warehouse. Ben Fish's president flew to Idaho and met with Clements. As a result of those negotiations, Shields and Clements voided their March 6, 1985, contract on May 29, 1985, and Ben Fish and Clements signed a new contract on the same day, entitled "Bean Contract," consisting of an agreement typewritten on Ben Fish's letterhead. This new contract provided that Clements would plant, cultivate and harvest 80 acres of GBL 8–78 lima bean seed "with stock seed furnished by you at Shields Warehouse Co., Nampa, Idaho...." Unlike the Shields contract, this was not a bailment contract by which title to the bean crop remained in Ben Fish, but was rather a contract whereby Clements agreed to plant, cultivate and harvest GBL 8–78 stock seed, and Ben Fish agreed to purchase the crop of beans which conformed to the U.S. No. 1 grade standards and other conditions. Delivery was to be at the warehouse of Shields of Idaho. In the event that Shields was no longer operating, the agreement required Clements to deliver the beans at Triangle Bean at Homedale, Idaho.

The agreement which Clements signed further provided that:

> This agreement when accepted by you [Ben Fish] shall constitute a contract between us. There are no agreements or understandings regarding the subject matter of this agreement other than expressed above.

The contract was written on Ben Fish & Son letterhead. Immediately between the letterhead and the beginning of the "Bean Contract," and not surrounded by any other typing, was the following disclaimer which was written in smaller print than was contained in the balance of the contract:

> Ben Fish & Son warrants to the extent of the purchase price that seeds sold are as recognized on the container within recognized tolerances. Seller gives no further warranty, express or implied.[1]

This new Clements/Ben Fish contract was signed on May 29, 1985. The seed had already been delivered to Clements by Shields on May 8, 1985, pursuant to the original Shields/Clements contract; however, the seed had not yet been planted when the Shields contract was voided and the new contract with Ben Fish was signed on May 29, 1985. As the evidence later would show, the GBL 8–78 seed had an unusually slow maturation rate, rendering it more susceptible than most seed strains to crop loss in the event of a short growing season. The district court found that this unusual characteristic was not disclosed to Clements by Shields or by Ben Fish. Rather, the trial court found that Clements was simply advised by Ben Fish at the negotiations on May 29th to "get [the bean seed] in the ground as soon as possible." After preparing a field for cultivation, Clements planted the GBL 8–78 seed in mid-June. The crop was ultimately lost because of frost before it had matured.

Clements brought this action against Shields and the seed producer, Ben Fish, seeking reimbursement for money spent in attempting to grow the ill-fated crop. The case against the warehouse, Shields, was dismissed prior to trial. With respect to Ben Fish, Clements asserted a breach of an implied warranty of fitness under the Uniform Commercial Code. Clements alleged that Ben Fish had represented the seed to be capable of maturing into a harvestable crop. Following a bench trial, the district court rendered judgment in favor of Clements against Ben Fish for compensatory damages and attorney fees. Ben Fish appealed, and the Court of Appeals affirmed the trial court's decision. We granted review of the Court of Appeals decision.

 Regarding our standard of review, where a case comes to us on a petition for review from the Court of Appeals, we review the opinion of the district court directly. While we accord the views of our Court of Appeals serious consideration, we are not bound by those views. *State ex rel. Evans v. Barnett,* 116 Idaho 429, 776 P.2d 438 (1989). Additionally, the determi-

---

1. A copy of the contract is attached as Appendix A.

nation of a contract's meaning and legal effect are questions of law to be decided by the court where the contract is clear and unambiguous. *Galaxy Outdoor Advertising, Inc. v. Idaho Trans. Dept.*, 109 Idaho 692, 710 P.2d 602 (1985). On issues of law, this Court exercises free review. *Moses v. Idaho State Tax Comm'n*, 118 Idaho 676, 799 P.2d 964 (1990); *Safeco Ins. Co. of America v. Yon*, 118 Idaho 367, 796 P.2d 1040 (1990).

■ We first address the trial court's holding that the Clements/Ben Fish contract was a contract of bailment[2] and gave rise to an implied warranty of fitness by Ben Fish which was breached. Ben Fish argues that the May 29, 1985, contract between it and Clements was not a bailment contract. The Court of Appeals neither confirmed nor denied the trial court's bailment finding, stating simply that "we do not think the bailment controversy controls this case," and affirmed the trial court on the alternative rationale that, while the U.C.C. did not apply directly to the contract, by analogy the remedies of the U.C.C. were available to Clements.

First, it is clear that, unlike the original Shields/Clements contract, the Clements/Ben Fish contract was not a bailment/seed contract. Both the contract and the evidentiary record before us reveal that Clements was not a bailee of the bean seed *vis-a-vis* Ben Fish. The Clements/Ben Fish contract makes no reference either to bailment or to the title to the seed. The evidence in the record is uncontroverted that the seed, while initially produced by Ben Fish, was sold to Shields, who then delivered it to Clements on May 8, 1985, pursuant to the Shields/Clements bailment contract which was subsequently voided. While the Clements/Ben Fish contract does refer to "stock seed furnished by you [Ben Fish] at Shields Warehouse Co., Nampa, Idaho," the uncontroverted facts are that, while Ben Fish initially furnished the seed to Shields, Clements received the seed from Shields pursuant to its March 6,

1985, bailment contract which was void on May 29, 1985. Clements received the seed from Shields on May 8, 1985, was always in possession of it, and would no doubt have planted the seed pursuant to its contract with Shields had not Clements become concerned about Shields' ability to perform because of its financial problems. Thus, on May 29, 1985, when Shields' and Clements voided the March 6, 1985, contract, and when Clements and Ben Fish entered into their bean seed contract on that same day, Clements was agreeing to plant and harvest lima bean seed which it already had in its possession, and Ben Fish was agreeing to buy the harvested crop under the terms and conditions set out in the bean contract. The bean contract between Clements and Ben Fish was not a bailment contract, and the district court erred in treating it as such.

Based on that record, appellant Ben Fish asserts two main issues on appeal. Ben Fish first contends that there is no support for the trial court's finding that there was created an implied warranty of fitness from Ben Fish in favor of Clements, since Ben Fish was in essence the purchaser and not the seller under the May 29, 1985, contract. Secondly, Ben Fish argues that even if it were a seller under the bean contract, the contract has an express disclaimer of any warranty, express or implied. On this latter issue, we agree with appellant's argument and therefore vacate the decision of the Court of Appeals and reverse the decision of the district court.

Under the U.C.C., § 28-2-316, parties to a sales contract may effectively disclaim any warranties by an appropriate disclaimer in the contract. The trial court acknowledged the disclaimer, but concluded that the disclaimer contained in the Clements/Ben Fish contract was not sufficiently conspicuous and therefore did not meet the requirements of the U.C.C.

■ The U.C.C. provides that a warranty disclaimer is conspicuous when "it is so

---

**2.** *Our prior cases indicate that a bailment seed contract occurs when a seed warehouse delivers seed to a farmer, retaining the title to the seed, under a contract by which the farmer agrees to* grow the seed, usually to certain stated standards, and then redelivers the crop back to the seedman who, under the contract, retains title to both the original seed and the resulting crop.

written that a reasonable person against whom it is to operate ought to have noticed it." *I.C.* § 28–1–201(10). A disclaimer in a contract is conspicuous "if it is in larger or other contrasting type or color." *Id.* "Whether a term or clause is 'conspicuous' or not is a question for the court." I.C. § 28–1–201(10). *Farmer v. International Harvester Company,* 97 Idaho 742, 553 P.2d 1306 (1976). With respect to the disclaimer in this case, the trial court merely stated: "It is in fine print under the letter head at the top of the page. It is not conspicuous as required by the statute."

 Fine print of itself, however, does not render a disclaimer inconspicuous. The statute says that disclaimers in "contrasting" type are conspicuous; the statute does not say the type must be both contrasting and larger. Nor does the fact that the disclaimer is "under the letterhead," but above the body of the contract, detract from its conspicuousness; on the contrary, in this case it amplifies its visibility and increases the likelihood of discovery. The disclaimer is located in the middle of the front page of the contract and is set off by indentation. It is short, direct, and is not surrounded by any other language. We believe a reasonable person would have noticed the disclaimer and accordingly we hold that it was conspicuous. *Farmer v.*

*International Harvester Company,* 97 Idaho 742, 553 P.2d 1306 (1976).

Additionally, the written portion of the contract, immediately preceding the signatures, states:

> This agreement when accepted by you [Ben Fish] shall constitute a contract between us. There are no agreements or understandings regarding the subject matter of this agreement other than expressed above.

There is nothing in the agreement which suggests that, in the event that Clements was not successful in raising a crop of beans which met the standards set out in the contract, Ben Fish would reimburse Clements for its expenses in attempting to raise the crop.

Accordingly, we hold that, based upon our independent review of the written contract and uncontroverted evidence in the record, the "bean contract" effectively disclaimed the implied warranty of fitness claimed by Clements. Accordingly, the district court's judgment in favor of Clements is reversed and the cause remanded with directions to enter judgment in favor of appellant Ben Fish.[3]

Costs to appellant. No attorney fees allowed.

JOHNSON, BOYLE and McDEVITT, JJ., concur.

---

**3.** Since we have found the disclaimer in this case to be conspicuous within the meaning of the statute, we need not address the issue raised by Ben Fish that, under the May 29, 1985, contract with Clements, it was a buyer, rather than a seller, and therefore no implied covenant under the U.C.C., or by analogy, could occur.

**190**

# BEN FISH & SON
### SEED BEAN GROWERS
QUALITY SEED SINCE 1875

MAILING ADDRESS:
P. O. BOX 417
CROWS LANDING, CALIFORNIA 95313

AREA CODE 209 837-4726

OFFICE, RESEARCH and PROCESSING:
25 EAST 5TH STREET
CROWS LANDING, CALIFORNIA 95313

BEN FISH & SON WARRANTS TO THE EXTENT
OF THE PURCHASE PRICE THAT SEEDS SOLD
ARE AS DESCRIBED ON THE CONTAINER WITHIN
RECOGNIZED TOLERANCES. SELLER GIVES NO
FURTHER WARRANTY, EXPRESS OR IMPLIED.

## BEAN CONTRACT

_____ *May 24*, 19 *85*

I/We ___*Clements Farms Inc.*___, agree upon the terms and conditions stated below to raise for you on land suitable in quality and conditions on the *Clements* Ranch at ___*Nampa*___, Idaho, ___*80*___ acres of *FiSX P-78* Lima Beans.

I/We agree to properly prepare and plant in 19 *85* such land with Stock Seed furnished by you at Shields Warehouse Co, Nampa, Idaho; to properly care for, cultivate and harvest the crop in such a manner as to secure the greatest possible return of suitable quality beans, and to deliver all beans for your account at Shields of Idaho Co., Nampa, Idaho, as soon as the beans are threshed, and before November 30, 19 *85*, without wasting, selling, reserving, or allowing any portion of the seed stock or crop to pass from my/our possession, except as delivered to you.

I/We agree that all beans grown under this Contract shall be delivered in sound merchantable condition, FOB Warehouse, and that all warehouse operations necessary shall be used in order that the beans conform to the standard of U.S.#1 Grade, as established by the United States Department of Agriculture, The Beans cannot exceed moisture of 16%. Drying and sorting charges because of high moisture are for the account of the grower. I/We (You) agree to pay the cleaning, storage and other warehouse charges. Minimum requirements of 75% color and 85% germination must be met.

In consideration of the faithful carrying out of the conditions of this agreement, and as full compensation for the crop and for my/our services, you are to pay me/us at the rate of $.*21.00* per Hundred Pounds for the U.S.#1 weight of marketable beans that is delivered according to the conditions of this Contract. Payment is to be made as follows.

*December 31, 1985*

In the event that Shields of Idaho is no longer operating, the beans are to be delivered to Triangle Bean at Homedale, Idaho for processing.

This agreement when accepted by you shall constitute a Contract between us. There are no agreements or understandings regarding the subject matter of this agreement other than expressed above.

ACCEPTED: ___*May 29*___, 19 *85*

BEN FISH & SON
BY ___*Paul Y. Fish*___

GROWER *M. J. Clements*
*Rt. 4 Box 4159 Nampa*
ADDRESS ___*Idaho 83651*___

CUSTOM BRED LIMA BEAN SEED FOR CANNERS AND FREEZERS

---

BISTLINE, Justice, dissenting.

## PART I.

Narrowing down the factual scenario as portrayed in the Court's opinion to those necessary for a determination, there exists no reason for including Shields Seed Company. The legal relationship here pertinent involves only *two* parties and culminated in the signing of a written agreement entered into by only those *two* entities, Clements Farms, Inc., an Idaho corporation, and Ben Fish & Son, which may or may not have been incorporated. The contents of the

written agreement, titled "Bean Contract," of May 29, 1985, spelled out the terms agreed upon, and those determine the exact nature of the relationship.

As the Court's opinion points out, prior to the two party contract of May 29 between Clements and Fish, there was a prior agreement between Clements and Shields, which the majority concludes was a "bailment," all of which amounts to nothing more than an historical footnote. Clements was identified therein as the "grower" and also as the "bailee" of the seed which Shields was obtaining from Ben Fish. Clements, as grower-bailee, was agreeing to take those seeds, to plant, cultivate, and harvest the crop. As noted, apparently on Shield's directions the Ben Fish stock seed had been shipped to Clements. The Clements/Shields contract referred to Clements "as the bailee of said seeds," which were further described therein as consisting of "9600 pounds of G–78 baby lima bean seed." The majority correctly states that the contract which involved those parties was mutually voided on May 29, 1985.

An entirely new transaction between Ben Fish and Clements was entered into, resulting in a written contract which is attached to the Court's opinion, and identified at trial as Plaintiff's Exhibit 3. The Chief Justice declares this contract to not be a contract of bailment. Today, in authoring the opinion for the Court, the Chief Justice *could* suggest and urge the overruling of prior seedmen contract cases which were judicially construed as bailments. I would agree, and together we should be able to scrounge up a third vote.[4] Beyond that point, the Court's opinion is a conglomeration of errors and unfounded and/or unnecessary statements.

The language of the new contract, consisting of six paragraphs, could not have been more specific. It was short, to the point, and explicitly clear. The first three of the six paragraphs of the contract spelled out exactly what Clements would be agreeing to:

(1) To raise for Ben Fish 80 acres of seed beans on Clements' land at Nampa, Idaho.

(2) To properly prepare and plant in 1985 such stock seed furnished by you [Ben Fish] at Shields Warehouse, Nampa, Idaho; to properly care for, cultivate and harvest the crop so as to secure the

---

4. In *Peterson v. Conida Warehouses, Inc.*, 98 Idaho 883, 575 P.2d 481 (1978), Justice Bakes wrote:

> In my view, the bailment theory accepted in *Kent [v. Campbell*, 80 Idaho 57, 324 P.2d 398 (1958) ] should be rejected by this Court, and not merely sidestepped as we have done in this case. I agree with Justice Bistline that it is stretching the concept of bailment beyond its breaking point to assert that one may deliver beans to another to plant them and harvest the crop and still retain title to the crop produced by the planting.

*Peterson*, 98 Idaho at 886, 575 P.2d at 484. Similar views were expressed in the specially concurring opinion which I had authored, also finding fault with the Court's opinion, but not the result reached:

> While I have little trouble in agreeing that this is not a sale, to my mind it does not necessarily follow that it is a bailment. To indulge in the fiction of calling a bailment that which is not a bailment does very little to promote jurisprudence as a science. My vote for affirmance, therefore, should not be construed as implying any conviction that the arrangement between Grimms and Conida was a bailment. Obviously, once those seed beans were planted, it was impossible for the Grimms to return the 'bailed goods,' which, in my view, is always the right of a bailee. *In-*

*dustrial Leasing Corp. v. Thomason*, 96 Idaho 574, 532 P.2d 916 (1974).

*Peterson*, 98 Idaho at 887, 575 P.2d at 487. This was followed by a full discussion explaining how this Court initiated the theory that one hundred pounds of X's beans planted in Y's ground by Y creates an agreement of bailment whereunder the bailor X becomes the owner of *all* the bean crop grown on bailee Y's ground. The specially concurring opinion concluded:

> I submit that it is unrealistic to continue to indulge in the fiction that a bean, which is irretrievably planted in the ground, and whose very existence as a bean ceases as it turns into a plant, may be the subject of a bailment, entitling the supplier of the bean to claim all the beans produced from that plant. The parties essentially *have entered into a joint venture*, with the seed company supplying the seed beans, and the grower, here the Grimms, supplying the land in which the beans may be planted, together with all the labor which goes into planting, cultivating, harvesting, and hauling to the warehouse. The Idaho court, in our *Ferry Co.* case, came close to the right answer where it spoke of 'a share of the net proceeds of the adventure.' 36 Idaho at 73, 209 P. at 1067.

*Peterson*, 98 Idaho at 887–88, 575 P.2d at 487–88 (emphasis added).

greatest return of quality beans, and to deliver all beans to your [Ben Fish] account at the Shields Warehouse, Inc. at Nampa, Idaho.

(3) To deliver all of said harvested beans in sound merchantable condition, ... you [Ben Fish] agree to pay the cleaning, storage and other warehouse charges.

The fourth paragraph stated that Clements' share of the net proceeds of the venture would be computed at the rate of $21 per hundred pounds of marketable beans delivered according to the conditions of the contract. The fifth paragraph was a direction to Clements which would become effective on the contingency of Shields being out of operation at delivery time, in which event "the beans are to be delivered to Triangle Bean at Homedale." The sixth and concluding paragraph was a short statement that, "This agreement shall constitute a contract between us. There are no agreements or understandings regarding the subject matter of the agreement other than expressed above." There were no other paragraphs. The agreement was duly executed.

Exactly that which I wrote thirteen years ago in *Peterson,* is again applicable:

The parties essentially have entered into a joint venture, with the seed company supplying the seed beans, and the grower, here the Grimms, supplying the land in which the beans may be planted, together with all the labor which goes into planting, cultivating, harvesting, and hauling to the warehouse.

*Peterson,* 98 Idaho at 888, 575 P.2d at 486.[5] The 1922 Supreme Court reached the con- clusion in *D.M. Ferry & Co. v. Smith,* 36 Idaho 67, 209 P. 1066 (1922), that such an arrangement constituted a bailment, which was accomplished by taking the easy path of relying upon a similar Montana case. Of importance, the court did give consideration to the fact that the "bailee" was entitled to compensation, and ruled "altogether immaterial" whether that compensation was fixed at a definite sum of money, or a share of the net proceeds of the adventure, or was to be computed upon the product of the undertaking. The case upon which it placed sole reliance was another *D.M. Ferry* case which came out of the Montana Supreme Court, and two excerpts out of 6 Corpus Juris, at 1096 and 1139. *D.M. Ferry & Co. v. Forquer,* 61 Mont. 336, 202 P. 193, 195 (1921).

Applicable here from the Montana opinion, as adopted and utilized by the 1922 Idaho Supreme Court, is the statement that the compensation of the grower of the bean seeds "is computed upon the product of the [joint] undertaking," or, equally valid, that the grower's compensation would be a share of the net proceeds of the joint venture.[6] 36 Idaho at 73, 209 P. at 1067.

In the instant case Clements, had there been a marketable product, would have received as his compensation the contractually stipulated $21 per hundred weight. Of course, there was no product, and that was the heart of the lawsuit: to fix onto Ben Fish liability for the loss suffered by Clements by expending its money, time, and effort in attempting to raise for Ben Fish a crop which could not be nurtured to frui-

---

**5.** Black's Law Dictionary, Centennial Edition (1891–1991), recognizes that "joint venture" and "joint adventure" are interchangeable and describe the identical legal relationship with one definition being "a one-time grouping of two or more persons in a business undertaking," and the other being "an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skills, and knowledge." Black's Law Dictionary 52, 839 (6th ed. 1991).

**6.** Thirteen years ago when I was the new kid on the block and Justice Bakes was the second newest, I honestly believed and felt certain that Justice Bakes did also, that our time and effort in writing special concurrences would divorce itself from the fiction that contracts for services rendered in planting seeds and harvesting bean crops are legally viewed as bailments, but would be recognized for the joint ventures they are and which in actuality is the correct terminology. A third vote failed to surface.

Today with the Chief Justice and I being the two older boys on the block, will there be a third vote for abrogating the bailment fiction of the year 1922? There should be. Today the Chief Justice has ably convinced three members of the Court to join in his *ratio decidendi* that conspicuousness is fulfilled by a disclaimer being in letters that are infinitely small—all of which is contrary to the example of conspicuousness provided in the Uniform Commercial Code.

tion, and accordingly should not have been planted, all of which was known to Ben Fish but not to Clements. The district court's decision was rendered by means of court-prepared findings of fact as augmented by a supplemental Memorandum of the same date:

The above cause came before the Court for trial without a jury on June 30 and July 1, 1987. The cause having been submitted, the Court now makes its findings of fact and conclusions of law.

### I.

That the Plaintiff was at all times hereinafter mentioned a corporation existing by virtue of the laws of the State of Idaho and maintains its principal place of business in Nampa, Idaho. Plaintiff is engaged in farm enterprises and operates farms in the State of Idaho.

### II.

That Ben Fish & Son, is a seed bean grower maintaining its principal place of business in the State of California. Ben Fish & Son's name is used by Dompe Warehouse Co., a California Corporation.

### III.

That Shields of Idaho, Inc., is an Idaho corporation maintaining its principal place of business in the State of Idaho.

### IV.

That Paul L. Dompe, president of Dompe Warehouse Co., is the authorized agent for defendant Ben Fish & Son and acted with the full authority of defendant Ben Fish & Son in all matters hereinafter alleged.

### V.

That on or about March 6, 1985, Plaintiff entered into a written contract for the growing of commercial beans with Defendant, Shields of Idaho, Inc., which said agreement was thereafter voided by the bilateral conduct of the Defendant, Shields of Idaho, Inc. and the Plaintiff. Said voided contract is hereinafter referred to as 'Shields Contract.'

### VI.

That on or about May 29, 1985, Plaintiff entered into a written contract with the Defendant, Ben Fish & Son, whereby said Defendant agreed to supply to the Plaintiff lima beans described by the Defendant, Ben Fish & Son, as GBL–8–78 to be grown by the Plaintiff in 1985 on approximately 80 acres of land occupied by the Plaintiff. That said Defendant, Ben Fish & Son, agreed to pay to the Plaintiff $21.00 per 100 pounds of US # 1 weight marketable beans. Said contract is hereinafter referred to as 'Ben Fish Contract.'

### VII.

That Defendant Paul L. Dompe acted as the agent of Defendant Ben Fish & Son in all matters related to the formation of the Ben Fish Contract.

### VIII.

That by virtue of the Shields and Ben Fish agreements referred to above, the Plaintiff had prepared the land, planted and cultivated and diligently attempted to grow said lima beans to maturity. However, due to the length of time required for said beans to grow from germination to maturity, the bean crop did not grow to maturity and was rendered worthless.

### IX.

That the Defendants, Ben Fish & Son and Paul L. Dompe, and each of them, impliedly warranted to the Plaintiff that the lima bean seed was capable of being grown to maturity by the Plaintiff under circumstances where the Defendants, and each of them, knew or should have known that the said lima bean seed had not been planted prior to May 29, 1985 and that due to such fact said bean seed would not grow into a mature crop in the time available for the crop to mature.

### X.

That the Defendants, and each of them, failed to disclose to the Plaintiff the average growing season for said lima beans and if the Defendants had so disclosed the growing season for said lima beans, the Plaintiff would have refused to enter into the Ben Fish Contract after the voiding of the Shields Contract.

### XI.

That as a result of the Defendants' breach of implied warranty, Plaintiff has incurred damages in the amount of $38,-952.49 for expenses incurred by Plaintiff in preparing, planting, irrigating, cultivating, and tending the said lima bean planting.

### XII.

That Plaintiff has been required to retain the services of attorneys to institute and prosecute this action and has agreed to pay said attorneys a reasonable fee. Plaintiff is entitled to reasonable attorneys' fees as provided in Idaho Code Sec. 12–121.

Wherefore, Plaintiff is entitled to Judgment against the Defendant in the amount of $38,952.49.

The memorandum attached hereto further explains these findings of fact and conclusions of law which are to be regarded as a part thereof.

Plaintiff's counsel is asked to provide a form of judgment for execution by the Court.

Attorneys fees to be awarded to Plaintiff will be included in the judgment upon submission of a memorandum of attorneys' fees and costs and resolution of any objection thereto.

DATED this 6th day of August, 1987.

/s/ W.E. Smith
District Judge

### MEMORANDUM

This memorandum is supplemental to and a part of the Findings of Fact and Conclusions of Law entered herein on even date herewith.

It is clear from the contract between Plaintiff and Ben Fish & Son that Ben Fish was to provide the lima bean seed and Plaintiff Clements agreed to grow the seed, the resulting crop to be owned by Ben Fish. The contract creates a bailment. *Kent v. Campbell*, 80 Idaho 57, 324 P.2d 399 [398] (1958). Under such conditions Ben Fish has the duty to know the growing season for the area to which the seed is being sent for planting and to supply a seed which has a reasonable chance to produce a crop. In the case at bar, seed was provided which had little chance of bearing a crop. This is tantamount to a breach of implied warranty of fitness. Idaho Code § 28–2–315 should be applied in this bailment case. The Idaho Supreme Court has noted that in proper circumstances the implied warranty of fitness should be extended to equipment leases. *All–States Leasing v. Bass*, 96 Idaho 873, 538 P.2d 1177 (1975). *See also Glen [Glenn] Dick Equipment Co. v. Galey Const. Co.*, 97 Idaho 216, 541 P.2d 1184 (1975). The case at bar is one in which it is appropriate to extend the warranty to a bailment. See Anno: 4 A.L.R. 4th 85 *et seq.* Without question Ben Fish was in the best position to know and did know the growing time for its seed. Since Ben Fish should have known the available growing season in the Nampa area, under the circumstances of this case Ben Fish should bear the risk and consequence of a crop failure caused by lack of available growing season to produce a crop. The new contract signed by Plaintiff and Ben Fish is silent regarding which party takes the risk of a crop failure for any cause. The contract provides Clements will properly care for, cultivate and harvest the crop. Clements did care for and cultivate the crop. He did not harvest the crop because it was destroyed by the weather. The crop did not mature because the wrong seed was supplied in the first place and as the Court has held Ben Fish should have the risk of loss for that crop failure under the circumstances of this case.

Implied warranties of suitability can be disclaimed but courts tend 'to construe strictly language negating the implication of such a warranty.' *Glen* [*Glenn*] *Dick, supra* at p. 225 [541 P.2d 1184]. A disclaimer does appear on the parties' contract. Plaintiff's exhibit 3. It is in fine print under the letter head at the top of the page. It is not conspicuous as required by the statute. Idaho Code 28–2–316(2); nor does the disclaimer 'make it plain' that an implied warranty has been disclaimed. *Lee v. Peterson,* 110 Idaho 601, 716 P.2d 1373 (Ct.App.1986).

In view of the Court's decision, the Court does not consider the quantum meruit issue raised by counsel in his situation.

Accordingly, for the reasons and findings herein the Plaintiff should have the judgment in this case.

DATED this 6th day of August, 1987.

/s/ W.E. Smith
District Judge

### FOOTNOTE

See also 8 C.J.S. Bailments, Sec. 3(7), pp. 345 and 346; 8 Am.Jur.2d, Bailments, Sec. 38, p. 773. Such a contract was also held to constitute a bailment in *D.M. Ferry and Co. v. Smith,* 36 Idaho 67, 209 Pac. 1066 (1922). The same position was expressed in *Smith v. Washburn–Wilson Seed Co.,* 40 Idaho 191, 232 Pac. 574 (1925). However, in a case where the interest of a landlord in a share cropping interest conflicted with the interest of a bailor who provided the seed to the tenant, the court overruled *Ferry v. Smith (supra)*. *Washburn–Wilson Seed Co. v. Alexie,* 54 Idaho 727, 35 P.2d 990 (1934). On the other hand in *Kent v. Campbell,* 80 Idaho 57, 324 P.2d 398 (1958) the court again utilized the bailment theory. In *Peterson v. Conida Warehouses, Inc.,* 98 Idaho 883, 575 P.2d 481 (1978), the court again had to resolve conflicting interests arising between a crop sharing contractor and a seed providing bailor. The court then relied on *Washburn–Wilson Seed Co.*

*v. Alexie* as being on all fours but declined an invitation by counsel to overrule *Kent v. Campbell.* However, two justices in *Alexie* severely attacked *Kent v. Campbell* believing it should be overruled. In *Chapman v. Haney Seed Co.,* 102 Idaho 26, 624 P.2d 408 (1981), the Supreme Court again declined an opportunity to overrule *Kent v. Campbell.* Hence, *the court having found no later cases has concluded Kent v. Campbell is still the law in Idaho.*

(Emphasis added.)

The entire thrust and *ratio decidendi* of today's opinion by the Court is found in language which belongs more to a revival meeting: "*We believe* a reasonable person would have noticed the disclaimer...." at 189, 814 P.2d at 921. In those ten words, four appellate judges reject the meticulously written decision of the district judge. As happens more often than not, when the Chief Justice authors an opinion, that opinion immediately garners a majority, and thus the belief of the Chief Justice becomes the belief of four justices. Today four justices, each acting with reason, declare that they would have noticed the purported disclaimer—notwithstanding that it did *not* appear in the body of the contract and there was no language in the body of the contract incorporating it by reference. Moreover, the we-believers necessarily must also *believe* that the disclaimer is not just a free standing disclaimer as to any and all warranties, but is as to a specific warranty of fitness.

Unfortunately the four justices are remiss in failing to understand that this Court is *not* a fact-finding body. This Court sits to determine whether the lower trial courts have committed error. Fact finding is not the province of appellate courts. This Court nevertheless presumes itself authorized to decide a factual issue, namely whether or not Clements should have noticed the purported disclaimer. In so doing it errs grievously. When a jury has not been requested, the district court becomes the trier of fact. To Judge Smith, in the instant case fell, the obligation to

decide from the evidence whether Ben Fish & Son carried its burden of establishing that it had called Clement's attention to the purported disclaimer, or that the notice of disclaimer was reasonably conspicuous and should have been noticed. To the contrary, and not mounting to the level of conspicuous, and rather *in extremely fine print* appearing below the letterhead but above the word CONTRACT was the purported disclaimer.

Moreover, the district judge, and he alone where there was no jury involvement, is the finder of fact, in which capacity he uses the ordinary common sense and knowledge which any juror as a fact finder would do. Yet, here we have four appellate justices taking it upon themselves to usurp the function of the trial court as the fact finder, and supplant his decision with their own notions of what a reasonable person would observe on reading plaintiff's Exhibit 3.

The majesty of the majority opinion is found at 188, 814 P.2d at 920, where it is stated that Ben Fish's contract, a printed form with blanks provided for writing in names, contains an express disclaimer of any warranty, express or implied. The majority continues "believing," and, accordingly "agreeing," that Clements is chargeable with being put on notice of the purported disclaimer. Conceding to a lack of knowing all of the contents of the five hundred seventy-seven pages of the Uniform Commercial Code, which comprises all of Volume 5A of the Idaho Code, I am not unaware of subparagraph (10) of I.C. § 28-1-201. Believing it to be in the interest of justice and hoping to attract the attention of the three justices who may not have found time to peruse the transcripts and clerk's record, subparagraph (10) has been reduced to equal the size of the print which comprises the Ben Fish & Son disclaimer:

(10) "Conspicuous": A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON-NEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. But in a telegram any stated term is "conspicuous." Whether a term or clause is "conspicuous" or not is for decision by the court.

I.C. § 28-1-201(10).

The greater majesty of the majority opinion is the cavalier manner in which it discounts Judge Smith's ruling that the purported disclaimer notice was inoperative because of the exceptionally fine print which rendered it not conspicuous. The Court seeks to accomplish this objective by reading into I.C. § 28-1-201(10) its *belief* that the section properly reads that a purported disclaimer will be considered "conspicuous" if it is in larger eye-catching letters, *and also if it is found in unreadable small print which is smaller than the body of the contract.*

Idaho Code § 28-1-201(10) simply does not authorize disclaimers utilizing very small lower case print, no matter what style of type, to fulfill the function of being conspicuous. The drafters did not leave to chance the ingenuity of clever minds. Idaho Code 28-1-201(10) provides an example of what amounts to being conspicuous: "A printed heading in capitals (as NON-NEGOTIABLE BILL OF LADING) is conspicuous." To be somehow otherwise conspicuous, the same section (10) does allow that language appearing within the body of a form is "conspicuous" if such disclaiming language is in larger or other contrasting type or color. But in no way does subsection (10) state, suggest, or intimate that a disclaimer appearing in exceedingly small letters fulfills the requirement of being conspicuous to the same extent that capital letters do. It is statutory law which both requires and allows that capital letters serve the function of being conspicuous. In the case at hand there is no involvement of different colored ink, and but one single piece of paper is involved and it is blank on the reverse side. The letterhead, the purported disclaimer, and the heading *CONTRACT* are all in black, and all on one side of a single sheet of paper. The "contract" itself discloses at a glance that there are not contained therein, meaning in the body of the text, any words which in any way contrast with one another. The Court finds itself tampering with a statute, not a rule of the Court, and in so doing not only committing error, but doing a disservice to the district court and an injustice to the plaintiff.

Judge Smith correctly ruled that the purported disclaimer "is not conspicuous as required by the statute." The Court's opinion acknowledges reading that conclusion, at 188, 814 P.2d at 920, and dismisses Judge Smith's finding and conclusion with a most outstanding pairing of an *ipse dixit* and a *non sequitur:*

> Fine print of itself, however, does not render a disclaimer inconspicuous. The statute says that disclaimers in 'contrasting' type are conspicuous; the statute does not say the type must be both contrasting and larger. Nor does the fact that the disclaimer is 'under the letterhead,' but above the body of the contract, detract from its conspicuousness; on the contrary, in this case it amplifies its visibility and increases the likelihood of discovery. The disclaimer is located in the middle of the front page of the contract and is set off by indentation. It is short, direct, and is not surrounded by other language. We believe a reasonable person would have noticed the disclaimer and accordingly we hold that it was conspicuous.

The first sentence of that paragraph should gain a place in history as the most classic nullity flowing from an appellate review. Judge Smith had no concern as to whether fine print rendered a disclaimer *inconspicuous.* The Uniform Commercial Code likewise shows no concern for that which is *inconspicuous.* That word is not to be found in I.C. § 28–1–201(10). That Idaho statute deals with that which *is* conspicuous, and whether sufficiently so as to fulfill that requirement with regard to a disclaimer, the successful use of which may free a seller, a lessor, or a joint venturer furnishing unfit seeds, from liability.

The second sentence which follows is equally nonpersuasive. Foremost, it is lacking in any HEADING which might possibly, and certainly not probably, bring to anyone's attention that it purports to be a disclaimer as to warranties. This, too, was not by the drafters of I.C. § 28–1–201(10) left to chance and man's ingenuity. The statute speaks in terms of what will be considered "conspicuous" insofar as there may be a claimed defense of disclaimer. The statute requires a heading. The statute is definite that a heading in capital letters be provided, and allows that the use of capital letters will fulfill the function of being conspicuous.

This Court's opinion very carefully avoids any discussion of, or even mention of, the subsection (10) language providing that a printed HEADING in capitals is the first and foremost manner of evidencing some kind of an honest intent to call out to the reader, "kindly observe our disclaimer policy." Various editions of dictionaries provide the definition of "heading" as: "An inscription, headline, or title standing at the top or beginning (as of a letter or a chapter)." *Webster's New Collegiate Dictionary* (1977); *American Heritage Dictionary of the English Language* (1977). Subsection (10) also provides that "language in the body of a form is 'conspicuous' if it is larger or other contrasting type or color," which statement is carefully not mentioned in the majority opinion. The reason is obvious, there simply is no use of contrasting or colored type in the body of the agreement. There simply is not any compliance with the statutory requirement provisions.

The strongest point being promoted by the Court in attempting to justify its result is that the disclaimer is located in the middle of the front page of the contract and is set off by indentation. If there had been a capital letter disclaimer heading, and unless that disclaimer heading was directly *below* the two words "Bean Contract," it still "is not within the four corners of the contract" as years ago I heard older, wiser attorneys say.

Where the majority has already portrayed its rationale by diverting attention to what might be *inconspicuous,* it has also gone far afield in another negative statement as meaningless and brings little credit for being uttered:

> There is nothing in the agreement which suggests that, in the event that Clements was not successful in raising a crop of

beans which met the standards set out in the contract, Ben Fish would reimburse Clements for its expenses in attempting to raise the crop.

At 189, 814 P.2d at 921. The Clement's law suit, as pleaded and pursued at trial, neither alleged nor pursued such a claim as the basis for relief. The claim based liability for the reasons which the district court provided as set forth herein.

## PART II.

In mounting an attack on the validity of the Court's opinion, it is in order to first observe the attack which it makes against Judge Smith's holding that the Clements/Ben Fish contract was one of bailment:

> We first address the trial court's holding that the Clements/Ben Fish contract was a contract of bailment and gave rise to an implied warranty of fitness by Ben Fish which was breached. Ben Fish argues that the May 29, 1985, contract between it and Clements was not a bailment contract.
>
> . . . .
>
> First, it is clear that, unlike the original Shields/Clement contract, the Clements/Ben Fish contract was not a bailment/seed contract. Both the contract and the evidentiary record before us reveal that Clements was not a bailee of the bean seed *vis-a-vis* Ben Fish. The Clements/Ben Fish contract makes no reference either to bailment or to the title to the seed. [The evidence in the record is uncontroverted that the seed, while initially produced by Ben Fish, was sold to Shields, who then delivered it to Clements on May 8, 1985, pursuant to the Shields/Clements bailment contract which was subsequently voided. While the Clements/Ben Fish contract does refer to 'stock seed furnished by you [Ben Fish] at Shields Warehouse Co., Nampa, Idaho,' the uncontroverted facts are that, while Ben Fish initially furnished the seed to Shields, Clements received the seed from Shields pursuant to its March 6, 1985, bailment contract which was void

on May 29, 1985. Clements received the seed from Shields on May 8, 1985, was always in possession of it, and would no doubt have planted the seed pursuant to its contract with Shields had not Clements become concerned about Shields' ability to perform because of its financial problems.] Thus, on May 29, 1985, when Shields and Clements voided the March 6, 1985, contract, and when Clements and Ben Fish entered into their bean seed contract on that same day, Clements was agreeing to plant and harvest lima bean seed which it already had in its possession, and *Ben Fish was agreeing to buy the harvested crop* under the terms and conditions set out in the bean contract. The bean contract between Clements and Ben Fish was not a bailment contract, and the district court erred in treating it as such.

At 187–188, 814 P.2d at 919–920 (brackets supplied; emphasis added).

## ONE JUSTICE'S ANALYSIS OF THE FOREGOING PARAGRAPHS

It is readily agreed that the Clements/Fish contract makes no reference or mention of the words "bailment" or of title to the seed. However, wholly immaterial and totally irrelevant is any mention or discussion of the voided, and thus rendered for naught, Shields/Clements contract. All of that above set out which I have enclosed in brackets amounts to nothing but superfluous filler, which is equally true of the full content of the second and third paragraphs at 188–189, 814 P.2d at 918–919.

The Chief Justice gets back on track with the statement that Clements had possession of the stock seed, it having been delivered to Clements on the direction of the owner, namely, Ben Fish & Son, at a time when Ben Fish was contemplating a sale of the stock seed to Shields. That is correct and occurred when Shields and Clements had put together their negotiations for Clements to raise the seed as Shields' bailee, which did result in a contract, but which contract was later mutually voided and canceled. Purely extraneous to the underlying issue is the Chief Justice's

hypothetical beliefs as to what might have happened except for the mutual voiding of the Shields/Clements contract. The Chief Justice then resumes with this statement:

Thus, on May 29, 1985, when Shields and Clements voided the March 6, 1985, contract, and when Clements and Ben Fish entered into their bean seed contract on that same day, Clements was agreeing to plant the harvest lima bean seed which it already had in its possession, and *Ben Fish was agreeing to buy the harvested crop* under the terms and conditions set out in the bean contract. The bean contract between Clements and Ben Fish was *not* a bailment contract, and the district court erred in treating it as such.

At 188, 814 P.2d at 920 (emphasis added).

## FURTHER ANALYSIS BY ONE JUSTICE

The choice of words in the paragraph directly above, however, is definitely not correct and is misleading. Clements may have had the stock seed in his possession, but it was not Clements' stock seed. That stock seed was the property of Ben Fish. The Chief Justice misleads himself, and three other learned justices in the process, with his statement that "Ben Fish was agreeing *to buy* the harvested crop...." There is no validity whatever in that statement. No such language or anything faintly resembling that language is to be found in the contract. *Why would Ben Fish agree to purchase the product of his own stock seed?* No reason, and *a fortiori*, Ben Fish did not. To the contrary, Ben Fish, by the agreement which is drafted on his own letterhead stationery, exacted from Clements an agreement which obligated the latter to obtain possession and control of Ben Fish's stock seed for the sole purpose of sowing it in Clements' 80 acres. That supply of stock seed which Clements would be furnished probably was, even as the Chief Justice asserts, then in storage which, by happenstance, was the Shields' warehouse. However, Shields, of course, was no longer involved, having entered into a mutual cancellation voiding the contract that Shields at one time had with Clements, which explains why the Ben Fish stock seed happened to be in the Shields warehouse when the Clement/Shields contract was canceled and the Ben Fish/Clements contract was executed. If the seed, or any part of it, had been *sold* to Shields in exchange for currency, later, on the mutually agreed cancellation of the Clements/Shields contract any money which Shields might have paid to Ben Fish would have been returned. The appellant's brief purports to state what the controversy is over:

This is an action for the loss of a lima bean seed crop to have been grown by the plaintiff during the crop year 1985. Initially the plaintiff contracted with Shields of Idaho, Inc. to grow the lima bean crop for Shields of Idaho, Inc. with seed purchased by Shields of Idaho, Inc., from the defendant. When the plaintiff learned that Shields of Idaho, Inc., was in financial distress, he refused to perform his contract to grow this seed for Shields of Idaho, Inc. Later, the Shields contract was voided and the plaintiff contracted with the defendant to grow the seed crop from the seed it had purchased from Shields of Idaho, Inc. The seed crop failed to mature and the plaintiff brought this action against the defendant, advancing several theories, including breach of implied warranty.

Excerpt from the Appellant, Ben Fish & Son's, opening brief, at 1.

The appellant's closing brief *purports* to restate and enhance what it had stated in the opening brief:

The [Ben Fish/Clements] contract, plaintiff's Exhibit 3, signed by the parties was not a bailment contract but was simply a contract for the sale and purchase of the 1985 lima bean crop of the plaintiff to the defendant. The seed which was planted [by Clements] was sold by the defendant [Ben Fish] to Shields of Idaho, Inc. The seed was not sold by the defendant [Ben Fish] to the plaintiff [Clements]. This contract is unlike that in *Kent v. Campbell, supra.* The defendant did not have title to the seed used. Title had previously passed to Shields of Idaho, Inc., when at an earlier time it was sold by defendant to

Shields of Idaho, Inc. [In turn title to the seed passed to the plaintiff when plaintiff purchased it from Shields of Idaho, Inc.]

Excerpt from Appellant, Ben Fish & Son's, brief, at 12. It is a simplistic factual scenario.

The excerpts from the two briefs submitted by Ben Fish are disturbing and confusing. The contention being urged therein seems to be that Clements became the *owner* of the seed stock which initially had come into the possession of Shields and that instead of raising the crop of seed bean for Ben Fish, all according to the written Clements/Ben Fish contract. Clements was raising *his own* seed stock for himself. Ben Fish was only involved, so the two above excerpts from the Ben Fish briefs tell us, because, according to the terms of their contract, supposedly Ben Fish had agreed to purchase the product of the very seed stock which was his own.

It is exceedingly strange that neither of the two excerpts found respectively at pages 1 of the opening brief and page 12 of the closing brief are supported by any citation to the record, to the transcripts, or to the exhibits. This is not a matter of small moment. Appellate judges have two options when a brief is so lacking in quality. The first, and the one which has taken our Chief Justice into camp, is to believe that the author of the brief would not have said it, if it were not true. The other option is for appellate judges to search the record painstakingly in order to ascertain if questionable assertions just might happen to be true. Compounding this unusual circumstance where we are left to wonder what is and what is not, on page 4 of the opening brief we are told that during the week of May 22–28, 1985, "it was agreed that Ben Fish & Son would enter into a contract with the plaintiff to purchase these beans that he was to grow for Shields...." The only cite we see is "Plaintiff's Exhibit 3," which, of course, we do have and which shows us a contract which is *not* a contract calling for Ben Fish to *purchase* any seeds! Rather, it is for Clements to raise those seeds for Ben Fish.

In a sentence preceding the foregoing, the Ben Fish brief mentioned some conversations between Clements and the defendants which took place between May 22 and May 28, which inferentially was supposedly in support of the above statement that "it was agreed that Ben Fish & Son would enter into a contract with the plaintiff to *purchase* these beans." The citation to the supporting conversations is Tr. Vol I, p. 39, L. 5–12. Looking at that passage produces the following question and answer, which takes place with Clements on the stand during direct examination in plaintiff's case in chief:

Q. Does that refresh your recollection as to when you may have placed a call to Mr. Dompe in California?

A. Well, yes. On the 22nd of May and the 28th of May. It shows calls to Crows Landing, California. Both calls are to the same number and I'm quite sure that number is their business phone down there. I'm talking about Ben Fish company's business phone.

As is readily seen, that bit of testimony, does not provide any substantiation for the proposition that it was agreed that Ben Fish & Son would enter into a contract with Clements to *purchase* these beans. The fact of the matter is that Clements was agreeing to devote 80 acres of his land to the raising of a seed bean crop for Ben Fish, including cultivating and harvesting, and delivery, all for a share of $21 per hundred pounds of beans.

The appellants seemingly go far afield in trying to be persuasive that Ben Fish & Son's involvement was a promise "to buy" the ultimate crop (of which there was none) whereas in truth he was the actual owner of the seed stock and entered into a joint venture which would result in him owning all of the product derived therefrom, and subject only to his contract with Clements whereunder Clements would be recompensed for his time, effort, and expenses at a set figure of $21 per hundred weight of harvested beans.

Although the Chief Justice is correct in believing that the relationship between Ben Fish and Clements ought not to be con-

sidered a bailment, that one good suggestion pales in significance when he then proceeds to declare it to be a sales transaction:

> Thus, on May 29, 1985, when Shields and Clements voided the March 6, 1985, contract, and when Clements and Ben Fish entered into their bean seed contract on that same day, *Clements was agreeing to plant and harvest lima bean seed* which it already had in its possession, and *Ben Fish was agreeing to buy the harvested crop under the terms and conditions set out in the bean contract.*

At 188, 814 P.2d at 920 (emphasis added). Paramount to the views of this "one justice," [7] the conclusion is belied by the then-existing facts and circumstances. It is true that Shields and Clements canceled their contract, and it is true that Clements was agreeing to plant and harvest the lima bean seed. It is *not true* that Ben Fish was agreeing *to buy* the harvested crop. Fish was agreeing to pay Clements for the use of his land and for his services, a share of the product computed at the contractually stipulated $21 per hundred pounds of harvested beans:

> [T]he plaintiff contracted with the defendant to grow the seed crop from the seed it had purchased from Shields of Idaho, Inc. The seed crop failed to mature and the plaintiff brought this action against the defendant, advancing several theories, including breach of implied warranty.

Excerpt from the Ben Fish opening brief at 1.

In declaring that the Clements/Ben Fish contract was not the bailment contract which Judge Smith had declared it to be the Chief Justice apparently had a lapse of memory, forgetting that not one of three other members of the court sitting on the *Peterson v. Conida*, 98 Idaho 883, 575 P.2d 481, case joined either special concurrence. Judge Smith's views were based on the actual existing state of the law. While the two of us, Bakes, J. and Bistline, J., had urged the overruling of the prior cases which indulged in the fiction that a grower/seedman's contract *was* a bailment, with the seedman gathering in *all* of the product other than the grower's agreed share (if there was such a provision in the contract), there was no third vote. With the fiction having continued to exist, Judge Smith was not in error. Judge Swanstrom, in his dissenting opinion when the instant controversy was first decided by the Court of Appeals, made it abundantly clear that the unanimous opinion authored by Smith, J., joined by Keeton, C.J., and Porter, Taylor, and McQuade, JJ., still holds sway. *Kent v. Campbell*, 80 Idaho 57, 59, 324 P.2d 398, 400 (1958). Judge Smith in his memorandum also makes that point.

This Court as constituted in 1958, set out pertinent portions of the contract, *none* of which contained the words bailment, bailor, or bailee:

> The Company agrees to furnish the Grower with the stock seed for such purpose in the amount aforesaid, the title to such stock seed and to the seed crop produced therefrom to be and remain at all times in the Company except as otherwise stated.
>
> ... The receipt of the crop by the Company shall not constitute acceptance thereof hereunder.
>
> ....
>
> It is agreed that the Company shall, after delivery to it of such crop, examine and test the same to determine whether it is merchantable seed and of satisfactory germination, and the Company's decision thereof shall be conclusive as to whether the crop shall be accepted or not. The Company shall after such determination, notify the Grower of the result thereof.
>
> ....
>
> If the crop is accepted by the Company, the amount of merchantable seed thereof shall be determined by deducting from the amount delivered by the Grower such percentage as, in the judgment

---

[7] "One Justice" is the identity conferred upon the writer by the United States Supreme Court in its opinion in the *State v. (Bryan) Lankford,* — U.S. ——, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991).

of the Company after examination, shall equal the amount of culls, unmerchantable seeds, splits, dirt and other foreign material contained therein. There shall then be deducted the amount of stock seed furnished the Grower by the Company hereunder, and the purchase price for the remainder at the rate per pound aforesaid shall then be forthwith payable.

. . . .

In case the crop is not accepted by the Company, the title thereto shall forthwith thereupon vest in the Grower, whether in his possession or not, and if in the Company's possession, it shall thereupon be subject to the Grower's disposition at his risk.

*Kent*, 80 Idaho at 59, 324 P.2d at 400. The Court then went on in its opinion to state:

The crop contracts as drafted recognize the theory of bailment. The growers, respondents, recognized title to the beans to be in appellant, bailor; and respondents, bailees, fulfilled the requirement of the bailment by their delivery of the beans to the appellant with title thereto reposing in appellant, bailor. Thereupon, the bailments terminated, for then, as stated in the conversion action of *D.M. Ferry & Co. v. Forquer*, 61 Mont. 336, 202 P. 193, 195, 29 A.L.R. 642,

... the preponderant authority and better reasoning support the rule that upon the termination of the bailment, the identical thing bailed, or the product of or substitute for that thing, together with the increments, earnings and gains which may have accrued to it during the period of the bailment, must be re-delivered, delivered over, or accounted for by the bailee in accordance with the terms of the contract.

*Kent*, 80 Idaho at 60, 324 P.2d at 401. The contract terms might or might not include a provision that the grower's compensation would be a set amount, or a share of a joint venture enterprise fixed, as here, at so much per hundred weight of beans delivered by the grower.

I remain of the same view which Chief Justice Bakes and I shared thirteen years ago, *i.e.*, that a seedman's contract with a grower is not truly a bailment. The law should not remain cluttered up with an ancient, outmoded, and fictional concept, but, unfortunately, it is and will remain so, until *Kent v. Campbell* and its ilk are overruled. That has yet to take place, and for that very reason it is shameful that a respected trial judge is, by an unthinking Court, this day inappropriately held in error for having accepted and applied what still remains to be case law precedent. Every time that this Court erroneously declares a trial judge in error, when he most assuredly is not, a serious disservice is done to the entire trial bench, inclusive of all trial judges no matter which echelon. Today it is *this* Court which is in error, not the district court, and the error is manifold and grievous, for which reasons I respectfully and strongly dissent.

In the spirit of attaching informative and helpful appendices, which is assisted by the majority opinion's attachment of a copy of the contract at issue, in this case, I include the opinion of the Court of Appeals. That opinion should have been the end of this lawsuit. I would have been honored to join that opinion.

## APPENDIX

### COURT OF APPEALS OPINION, ISSUED MAY 31, 1990, Ct.App. No. 17149

BURNETT, J.

This appeal arises from a dispute between a farmer and a seed producer. The issues are whether the district court correctly (a) ruled that the Uniform Commercial Code was applicable to this case; (b) found that the seed producer had breached an implied warranty of fitness for a particular purpose under the UCC; (c) determined the extent of the farmer's damages; and (d) awarded attorney fees to the farmer. For reasons explained below, we affirm the judgment of the district court in all respects except the award of attorney fees.

## I

The issues are framed by a convoluted sequence of transactions involving the seed producer, the farmer and a seed warehouse. The seed producer is a California enterprise doing business as 'Ben Fish and Son.' It has developed numerous strains of proprietary lima bean seed to meet various agricultural needs. In order to test its products in differing climates, the seed producer has arranged through seed warehouses to have the beans grown by farmers across the country. In 1985, the seed producer sent one of its bean seed strains, known as GBL 8–78, to Idaho for testing. The seed was stored at Shields Seed Company, a seed warehouse in Nampa. Shields then contracted with the farmer, Clements Farms, Inc., to grow a lima bean seed crop from the seed provided. The contract provided that the farmer would be paid $21.00 per hundredweight when the proper grade of harvested seed crop was delivered to the warehouse.

In the early spring of 1985, before the seed had been planted, the farmer learned that the warehouse was in financial difficulty. Discussions ensued as to whether the warehouse would be able to purchase a harvested crop later in the year. When these discussions proved inconclusive, the farmer communicated with the seed producer in California, exploring the possibility of a direct bilateral agreement that would avoid any risk of a future default by the warehouse. The seed producer's president flew to Idaho and met with the farmer. With the knowledge and consent of the warehouse, the farmer and seed producer signed a new contract, consisting of a form agreement printed on the seed producer's letterhead. This new contract provided that the farmer would grow a crop from 'stock seed furnished by [the seed producer].' The farmer agreed to deliver the harvested crop to the seed producer, in care of the Shields warehouse; but if Shields was no longer in business by that time, delivery would be made at another warehouse. The new contract further provided for the farmer to receive from the seed producer the same price for a grown bean crop as the warehouse earlier had agreed to pay.

The new contract was signed on May 29, 1985. On that date, the seed was still unplanted. As the evidence later would show, the GBL 8–78 seed had an unusually slow maturation rate, rendering it more susceptible than most seed strains to crop loss if a frost occurred in the fall. The district court found that this unusual characteristic was not disclosed to the farmer by the seed producer or by the warehouse. Rather, the farmer was simply advised to 'get [the bean seed] in the ground as soon as possible.' After preparing a field for cultivation, the farmer planted the GBL 8–78 seed in mid-June. The crop ultimately was destroyed by frost before it had fully matured.

The farmer brought this action against the seed producer and the warehouse, seeking reimbursement for money spent attempting to grow the ill-fated crop. For reasons not important here, the warehouse was dismissed from the case. With respect to the seed producer, the farmer asserted a breach of an implied warranty of fitness under the Uniform Commercial Code. The farmer alleged that the seed producer had represented the seed to be capable of maturing into a harvestable crop. Following a bench trial, the farmer received a judgment for compensatory damages and attorney fees. The seed producer appealed.

## II

We now turn to the issues raised by the seed producer. We deal first with issues relating to liability under the Uniform Commercial Code; then we focus on the questions of damages and attorney fees.

### A

The seed producer argues that the Uniform Commercial Code should not apply to the farmer's claim because the contract did not provide for a sale of goods to the farmer. If there was any sale, the seed producer contends, it was a prospective sale of the anticipated crop by the farmer to the producer; thus, the producer was never in the position of a seller under the

UCC. This argument overlooks the fact that the seed producer referred to itself as the 'seller' in the contract it signed with the farmer. In a purported disclaimer of warranties, the contract stated: 'Ben Fish & Son warrants to the extent of the purchase price that *seeds sold* are as described on the container within recognized tolerances. *Seller* gives no further warranty, express or implied.' (Emphasis supplied.)

More fundamentally, the seed producer's argument disregards the first phase of the transaction, in which the seed producer furnished goods (the seeds) to the farmer. The question is whether such furnishing of goods in a commercial transaction should be treated as a sale under the UCC. The district court addressed this question obliquely, characterizing the furnishing of goods as a 'bailment,' to which the UCC could be extended. The seed producer now attacks the 'bailment' characterization and argues, in any event, that the UCC does not apply to bailments.

For reasons we will discuss in a moment, we do not think the bailment controversy controls this case. We pause, however, to acknowledge that many reported decisions have characterized seedman's contracts as bailments. *E.g., Washburn–Wilson Seed Co. v. Alexie,* 54 Idaho 727, 35 P.2d 990 (1934); *Smith v. Washburn–Wilson Seed Co.,* 40 Idaho 191, 232 P. 574 (1925); *D.M. Ferry and Co. v. Smith,* 36 Idaho 67, 209 P. 1066 (1922). On the other hand, this characterization has been questioned in some cases. *See Chapman v. Haney Seed Co., Inc.,* 102 Idaho 26, 624 P.2d 408 (1981); *Peterson v. Conida Warehouses, Inc.,* 98 Idaho 883, 575 P.2d 481 (1978) (Bakes, J., and Bistline, J., special concurring opinions). But the real linchpin of the district judge's decision is not his choice of bailment terminology; it is his underlying determination that the UCC and its warranty provisions should apply to the furnishing of goods in the commercial context presented here. We agree.

Article 2 of the UCC applies generally to commercial transactions involving sales of goods. The courts also have applied the Code's provisions by analogy to a variety of transactions other than sales, such as leases, bailments and loans of goods. Annot., *What Constitutes a Transaction, a Contract for Sale, or a Sale within the Scope of UCC Article 2,* 4 A.L.R. 4th 85 (1981 and later supplements). The Idaho Supreme Court has applied the UCC to a lease. *See All–States Leasing Co. v. Bass,* 96 Idaho 873, 538 P.2d 1177 (1975). The Court thereby has expressed its disagreement with decisions in a few other states, where courts have refused to extend Code warranties to non-sale transactions without express legislative authorization. *See, e.g., R & W Leasing v. Mosher,* 195 Mont. 285, 636 P.2d 832, 835 (1981); *Baker v. Promark Products West, Inc.,* 692 S.W.2d 844, 846 (Tenn.1985). Such narrow decisions have been criticized as violating the intent of the UCC's drafters, who declared in section 1–102 that the Code should 'be liberally construed and applied to promote its underlying purposes and policies.' *See* Special Project, *Article Two Warranties in Commercial Transactions: An Update,* 72 CORNELL L.REV. 1159 (1987).

In *All–States Leasing,* our Supreme Court said that one purpose of applying UCC warranties by analogy is that 'implied warranties can be extended to many transactions which could not be defined as sales but which are so like other cases where warranties are implied that they should be treated similarly.' 96 Idaho at 878, 538 P.2d at 1182 (quoting Farnsworth, *Implied Warranties of Quality in Non–Sales Cases,* 57 COLUM.L.REV. 653 (1957)). In another lease case, our Supreme Court noted that 'reasoning by analogy does not require us to apply Article 2 in toto ...; rather we need apply only those provisions which are sufficiently analogous.' *Glenn Dick Equipment Co. v. Galey Construction, Inc.,* 97 Idaho 216, 222, 541 P.2d 1184, 1190 (1975). The Court continued:

> [W]e will look to the commercial setting in which the problem arises and ... use Article 2 as 'a premise for reasoning only when the case involves the same considerations that gave rise to the Code provisions and an analogy is not rebutted by additional antithetical circumstances.'

*Id.* at 222, 541 P.2d at 1190 (quoting Note, *The Uniform Commercial Code as a Premise for Judicial Reasoning*, 65 COLUM.L.REV. 880, 888 (1965)).

Here, the furnishing of seed to the farmer closely resembled a sale of goods. The seed producer transferred the seeds, and the farmer received them, for valuable consideration. The fact that the consideration consisted of future services by the farmer, coupled with the seed producer's promise of future payment for a grown crop, does not defeat the logical application of the UCC to any issue regarding the seeds themselves. Although 'title' to the seeds may not have passed from the seed producer to the farmer, our Supreme Court's decisions in the lease cases have made it clear that passage of title is not essential to application of the UCC.

In short, to paraphrase our Supreme Court's language in *Glenn Dick Equipment*, we have examined the commercial setting in which the bean seeds were furnished by the seed producer to the farmer. We believe this case involves the same considerations that gave rise to the Code provisions. We perceive no circumstances antithetical to applying the Code. The UCC analogy fits. Therefore, we uphold the trial judge's ruling that the Code is applicable to this case.

### B

The next question, given the applicability of the UCC, is whether the trial judge correctly determined that the seed producer breached an implied warranty of fitness for a particular purpose under UCC § 2–315, codified in Idaho as I.C. § 28–2–315. The seed producer argues that (1) an implied warranty was not created; (2) even if it was created, it was effectively disclaimed in the contract; and (3) even if it was not effectively disclaimed, there was no actual breach of the warranty. We will address each contention in turn.

### 1

In order for a sale to create an implied warranty of fitness for a particular purpose, the seller must have reason to know the buyer's particular purpose; the seller also must have reason to know that the buyer is relying on the seller to furnish appropriate goods; and the buyer must have relied upon the seller's skill or judgment. I.C. § 28–2–315; *All–States Leasing*, 96 Idaho at 879, 538 P.2d at 1183. By analogy, the requirements here would be that the seed producer had reason to know the farmer's particular purpose for the seed; that the seed producer had reason to know the farmer was relying on the producer to furnish appropriate seed; and that the farmer did, in fact, rely upon the producer's skill or judgment regarding the seed. Each of these criteria frames a question of fact. Accordingly, we employ a clear error standard in reviewing the district court's determination that the warranty requirements have been satisfied. *Martineau v. Walker*, 97 Idaho 246, 542 P.2d 1165 (1975).

It is self-evident that the seed producer knew the farmer's purpose for the seed. The farmer sought to grow the seed into a harvestable crop pursuant to a contract with the seed producer. The remaining questions focus on the reliance criteria— whether the producer had reason to know the farmer would rely, and whether the farmer actually did rely, on the producer's judgment in furnishing appropriate seed.

As noted above, GBL 8–78 was a proprietary bean seed. It was developed and owned by the seed producer. The producer knew the bean would not grow everywhere; in fact, the producer was testing the seed in the Idaho climate. GBL 8–78 required a 120–day growing season. The farmer testified that the usual growing season for beans in southwestern Idaho was 90 days. The district court implicitly found that where the seed producer had unique knowledge about the seeds, the farmer necessarily relied—and the producer was deemed to know that the farmer would rely—upon the producer's judgment as to whether the seeds would serve their intended purpose.

It has been argued that both parties, in effect, had unique knowledge—the produc-

er as to the seed's unusual maturation rate, and the farmer as to the ordinary bean-growing time in southwestern Idaho. In our view, however, the ordinary bean-growing season was not information uniquely possessed by the farmer; it was information generally available. In contrast, the characteristics of the GBL 8–78 seed were proprietary information, not generally available. The farmer (Maurice Clements) testified that had he known the GBL 8–78 seed required a 120–day growing season, he would not have planted it. The record indicates that in order to avoid destruction by frost in the fall, it would have been necessary to plant the seed in mid-May. The contract between the farmer and the seed producer was executed on May 29, yet there was no disclosure to the farmer of the risk associated with planting after that date.

Upon these facts, we find no clear error in the district court's determination that the reliance criteria of UCC § 2–315 were satisfied. We conclude that there was an implied warranty of fitness for a particular purpose.

### 2

We now consider the seed producer's argument that it effectively disclaimed any implied warranty of fitness. Our Supreme Court has stated that the implied warranty of fitness can be disclaimed, but that the courts will 'construe strictly language negativing the implication of such a warranty.' *Glenn Dick Equipment Co.*, 97 Idaho at 225, 541 P.2d at 1193. Disclaimers must be in writing and conspicuous. I.C. § 28–2–316. A trial court must determine whether the disclaimer is 'so written that a reasonable person against whom it is to operate ought to have noticed it.' I.C. § 28–1–201(10).

In making this determination, the court must examine the entire document, comparing the disclaimer clause to the rest of the document for various relevant factors—location, type size, contrasting type, ink color, vagueness of terms, etc. None of these factors, standing alone, necessarily will de-termine the validity of a disclaimer clause. They must be weighed collectively. *See, e.g., Lee v. Peterson*, 110 Idaho 601, 604, 716 P.2d 1373, 1376 (Ct.App.1986) (disclaimer found ineffective where language failed to state plainly that no implied warranty existed); *Snake River Equipment Co. v. Christensen*, 107 Idaho 541, 549–50; 691 P.2d 787, 796–97 (Ct.App.1984) (review denied) ('as is' disclaimer in upper case type on separately signed addendum found conspicuous); *J & W Equipment, Inc. v. Weingartner*, 618 P.2d 862 (Kan.Ct.App. 1980) (disclaimer printed in bold upper case letters near signature line found conspicuous); *P.E.A.C.E. Corp. v. Oklahoma Natural Gas Co.*, 568 P.2d 1273 (Okla.1977) (disclaimer in small print on back of document found inconspicuous). Because the weighing of these factors is essentially a fact-finding function, we again apply a clear error standard of review. *Martineau v. Walker, supra.*

In the present case, as we have noted, the contract was written on Ben Fish & Son letterhead. Beneath the letterhead, in print smaller than that used elsewhere in the document, appeared the purported disclaimer quoted earlier in this opinion. The trial judge rejected this disclaimer as inconspicuous, noting that 'it [was] in fine print under the letterhead at the top of the page' and that it failed to 'make it plain that an implied warranty [had] been disclaimed.' The disclaimer clause was not printed, so far as the record before us discloses, in a contrasting ink color. Upon these facts we find no clear error in the trial judge's determination that the disclaimer clause was inconspicuous. We therefore uphold the judge's conclusion that the disclaimer was ineffective.

### 3

Because the warranty was not disclaimed, the next question is whether it was breached. In an action for breach of an implied warranty, the buyer has a burden of establishing the breach by a preponderance of the evidence. *Dickerson v. Mountain View Equipment Co.*, 109 Idaho 711, 716, 710 P.2d 621, 626 (Ct.App.1985).

Whether the seed producer breached its warranty in this case was a question for the trier of fact. *Martineau v. Walker, supra.*

The seed producer contends that there was no breach, although its argument—when closely examined—actually seems to be that if a breach occurred, it did not cause the farmer's crop loss. The seed producer maintains that failure of the seeds to produce a crop was due to the farmer's own error. Specifically, the producer points to the fact that the seeds were at the warehouse, and available for planting, as early as March. The farmer did not plant them until mid–June. The seed producer argues that if the farmer had planted the GBL 8–78 seed by mid–May, he would have obtained a harvestable crop. The difficulty with this argument is that it focuses on a time period when the farmer's contract was with the warehouse, not with the seed producer. Any delay during that period was occasioned by the farmer's legitimate concern over the warehouse's financial condition.

Focusing more particularly on the farmer's transaction with the seed producer, the dispositive fact—as found by the district court—is that the producer signed a new contract directly with the farmer on May 29, even though the producer knew that the seed was not then in the ground. The producer implicitly recommended planting the seed after that date, and the farmer did so. The farmer's actions were consonant with a reasonable belief that the GBL 8–78 seed, like other bean seeds he was planting that year, would have a normal maturation period. Given these circumstances, we perceive no clear error in the trial judge's findings that a breach of warranty occurred and that it caused the farmer's loss.

## C

We now turn to the damage issue. The seed producer attacks the damage award on two fronts. First, the producer contends that the trial court applied an incorrect legal standard in measuring damages. Second, the producer disputes the sufficien-cy of evidence to support the sum awarded by the trial court. We will discuss these contentions in turn.

### 1

The seed producer argues that the trial court erred by allowing the farmer to claim reimbursement of expenses rather than lost profits, which would require the court to ascertain the difference between the value of the crop actually raised and the crop that would have been raised under normal conditions, less the costs of maturing, harvesting and delivering the crop. *See generally Casey v. Nampa and Meridian Irrigation Dist.*, 85 Idaho 299, 304, 379 P.2d 409, 411 (1963). Our examination of the record, however, reveals that the seed producer failed to raise this issue before the trial court. Although the seed producer vigorously disputed the expenses claimed by the farmer, it never argued below—so far as our record reveals—that the correct measure of damages was lost profits rather than reimbursement of expenses. In effect, the case was tried on the farmer's assertion of a reliance interest, rather than of an expectancy interest, in the seed-growing contract. *See generally Brown v. Yacht Club of Coeur d'Alene, Ltd.*, 111 Idaho 195, 198–99, 722 P.2d 1062, 1065–66 (Ct.App.1986) (discussing these different interests and the recoveries pertinent to each).

An appellant is bound by the issues and theories upon which the case was tried below. Although a judgment may be sustained upon any legal theory, a new theory cannot be employed on appeal to attack the judgment. *Beaupre v. Kingen*, 109 Idaho 610, 710 P.2d 520 (1985); *Heckman Ranches, Inc. v. State*, 99 Idaho 793, 589 P.2d 540 (1979). Because the lost profits theory of damages was not framed below, it is not properly before this Court on appeal. We will not pursue it further.

### 2

The seed producer did effectively preserve its objection to the quantification of damages in light of the evidence presented. Damages for breach of contract need not

be proved with mathematical exactitude; they simply must be proven beyond speculation. *Haener v. Ada County Highway Dist.*, 108 Idaho 170, 174, 697 P.2d 1184, 1188 (1985); *Wing v. Hulet*, 106 Idaho 912, 684 P.2d 314 (Ct.App.1984). We will not disturb a judge's measure of damages unless it is clearly erroneous. *Davis v. Gage*, 109 Idaho 1029, 712 P.2d 730 (Ct.App.1985).

Here, the dollar figures and supporting evidence need not be recounted in detail. It suffices to say that the farmer provided the court with a thorough breakdown of costs, calculated from extensive records, which the trial court accepted. Although the seed producer disputed many of the farmer's figures, the trial court found them to be reasonable. We find no clear error in the trial court's determination, and we will not disturb it.

### D

Finally, the seed producer challenges the trial court's award of attorney fees to the farmer. The court predicated this award upon a provision in I.C. § 12-120(3) which mandates a grant of attorney fees to the prevailing party in 'any civil action ... [on] any commercial transaction....' The reference to a 'commercial transaction' was added to I.C. § 12-120 on July 1, 1986. We have held, in *Myers v. Vermaas*, 114 Idaho 85, 753 P.2d 296 (Ct.App.1988), that the 1986 version of the statute may not be applied to a case filed prior to the effective date of the amendment. This case was filed in March, 1986. Consequently, the 1986 version of the statute should not have been applied. In fairness to the district judge, we note that he did not have the benefit of *Myers* when he made his ruling in the present case.

Moreover, we do not think the case falls within the pre-1986 version of I.C. § 12-120. Although that version refers to 'any civil action to recover on ... [a] contract relating to the purchase or sale of goods,' this case—strictly speaking—did not involve a 'sale of goods.' As we have explained, the transaction between the parties closely resembled a sale, thereby justi-fying application of the UCC by analogy; but the policy reasons for analogous extension of UCC warranties do not carry over to attorney fee questions.

Neither do we believe this case warrants a discretionary award of attorney fees under I.C. § 12-121. An award under that statute could be made only upon a finding that the seed producer defended against the farmer's complaint 'frivolously, unreasonably or without foundation....' I.R. C.P. 54(e)(1). The district court made such a finding, but its explanation for doing so focused in part on the seed producer's failure to offer a settlement or to respond to any settlement offer by the farmer. Our Supreme Court has held that refusal to engage in settlement negotiations is not a permissible basis for awarding attorney fees. *See Ross v. Coleman*, 114 Idaho 817, 836, 761 P.2d 1169, 1188 (1988). *Ross*, like *Myers*, was decided after the district court made its ruling in the present case.

An award of attorney fees under I.C. § 12-121 is a matter of discretion. Where, as here, such an exercise of discretion has been tainted by legal error, the proper appellate response usually is to remand the case for reconsideration in light of the proper legal framework. *Kunzler v. Kunzler*, 109 Idaho 350, 707 P.2d 461 (Ct. App.1985). A remand is unnecessary, however, when the appellate court is convinced that the lower court's ruling is an abuse of discretion in any event. *Id.*

Here, the issue of the seed producer's liability—predicated upon extension of the UCC by analogy—has been a fairly debatable question throughout this litigation. Attorney fee awards under I.C. § 12-121 are improper where the nonprevailing party has presented a 'genuine and fairly debatable' issue. *Wing v. Amalgamated Sugar Co.*, 106 Idaho 905, 911, 684 P.2d 307, 313 (Ct.App.1984). Moreover, we have held that an attorney fee award is inappropriate under I.C. § 12-121 if the case is not controlled by existing Idaho authorities but instead 'has helped to develop Idaho case law on the subject.' *Shelton v. Boydstun Beach Ass'n*, 102 Idaho 818, 641 P.2d 1005 (Ct.App.1982). Accordingly, with all due

respect to the capable district judge, we hold that the award of attorney fees in this case was an abuse of discretion and must be reversed.

In summary, the judgment of the district court is affirmed with respect to liability and damages, but is reversed with respect to attorney fees. Costs (exclusive of attorney fees) are awarded on appeal to the respondent-farmer.

WALTERS, C.J., concurs.