870 P.2d 1316

Kent MANN and Charles Mann, dba M & M Feedlot, Plaintiffs–Respondents,

v.

High Country Meats, Inc., a foreign corporation, Defendant,

and

Richard A. COONROD, Defendant–Appellant.

No. 20256.

Supreme Court of Idaho, Boise.

March 8, 1994.

White, Peterson, Perry, Pruss, Morrow & Gigray, P.A., Nampa, for appellant. Eric S. Rossman, argued.

Schiller & Schiller, Chtd., Nampa, for respondents. Edwin G. Schiller, argued.

358

TROUT, Justice.

## PARTIES

M & M Feedlot is owned and operated by Kent and Charles Mann (Mann), in Parma, Idaho. High Country Meats, Inc. (High Country) is a Utah corporation whose president is Wells Cannon (Cannon) and whose shareholders are Cannon and defendant Richard A. Coonrod (Coonrod). Coonrod is a resident of Edina, Minnesota.

## BACKGROUND

High Country entered into a contract with M & M Feedlot for the purchase of sixty-two veal calves which High Country was to pick up at the M & M Feedlot in Parma, Idaho. Pursuant to their agreement Mann released four of the calves to High Country. Because High Country was slow in making payment for those calves, Mann wanted payment guaranteed before the remaining calves would be released. Thereafter, Cannon initiated a three-way conference call from Utah between Kent Mann in Parma, Idaho and Coonrod in Edina, Minnesota. Mann asserted that during the telephone conversation Coonrod indicated that he would personally guarantee payment for any additional calves sold to High Country. Mann alleged that as a result of the conversation, he released the additional calves. While High Country did make payment on the sale of the calves in the amount of $9,000.00, Mann asserted that the sum of $19,846.00 plus interest was still due and owing on the sale.

Mann filed suit against High Country and Coonrod, individually, on February 22, 1991. On September 18, 1991, Coonrod filed a motion to dismiss alleging that the district court lacked personal jurisdiction over him. Kent Mann submitted his affidavit regarding the sale of calves to High Country, his beliefs regarding Coonrod's business involvement with High Country, and his version of the three-way conversation in which he contends payment was guaranteed by Coonrod. Coonrod submitted his affidavit directly contra-dicting Kent Mann's statements about Coonrod's business involvement and any alleged guarantee.

On December 4, 1991, the district court entered an order denying Coonrod's motion to dismiss based on lack of personal jurisdiction. After the order denying the motion to dismiss was entered, Coonrod and High Country filed an answer to Mann's complaint on January 15, 1992, continuing to deny any jurisdiction over them and asserting that to the extent there was any guarantee, it violated the statute of frauds. A trial was held on June 19, 1992. At trial the attorney for High Country and Coonrod argued to the court that M & M Feedlot should not be able to recover on the alleged guarantee by Coonrod, based upon the statute of frauds. The court found High Country liable for the unpaid balance on the contract and took under advisement the argument presented by Coonrod regarding the statute of frauds. In a supplemental order dated August 18, 1992, the court ruled that Coonrod was estopped from asserting the defense of the statute of frauds. Thereafter judgment was entered for Mann against High Country and Coonrod, jointly and severally, for the total sum, including interest and attorney fees, of $26,438.76. Coonrod filed a notice of appeal on October 13, 1992; High Country has not appealed from the entry of judgment against it.

The following issues were raised on appeal: 1) Whether the district court erred in exercising personal jurisdiction over Coonrod under the Idaho long-arm statute and under the Due Process Clause of the United States Constitution; and 2) whether the district court erred in ruling that Coonrod was estopped from raising the statute of frauds as a defense.

## STANDARD OF REVIEW

■ Idaho Appellate Rule 17(e)(1)(A) provides that a final judgment appealed from is deemed to include "[a]ll interlocutory judgments, orders and decrees entered prior to the judgment, order or decree appealed

from, ..." Thus this Court can review all orders entered by the district court prior to entry of the final judgment which involve issues on appeal. We therefore consider first the district court's order denying Coonrod's motion to dismiss based upon lack of personal jurisdiction and the affidavits filed in opposition to and in support thereof.

■ When reviewing an appeal from motions to dismiss based on lack of personal jurisdiction, we apply the same standard as when we review appeals from orders of summary judgment; we construe the evidence presented to the district court in favor of the party opposing the order and accord that party the benefit of all inferences which might be reasonably drawn. *Houghland Farms, Inc. v. Johnson,* 119 Idaho 72, 74–75, 803 P.2d 978, 980–81 (1990) (*citing Intermountain Business Forms, Inc. v. Shepard Business Forms Co.,* 96 Idaho 538, 540, 531 P.2d 1183, 1185 (1975)). Thus in reviewing the district court's ruling on the motion to dismiss we construe the evidence in favor of Mann.

## THERE WERE INSUFFICIENT FACTS ASSERTED FOR THE DISTRICT COURT TO EXERCISE PERSONAL JURISDICTION OVER COONROD UNDER THE LONG–ARM STATUTE.

After construing the evidence most favorably for Mann, the district court ruled that it had personal jurisdiction over Coonrod based upon allegations that Coonrod did guarantee the sales contract; that the contract was entered into over the telephone with an Idaho participant; and that the guarantee was of a sales contract to be performed in Idaho. We disagree with the court's conclusion.

■ In order for a court properly to exercise jurisdiction over an individual who is not subject to the "general" jurisdiction of the courts of the state of Idaho, there must be a legal basis for the assertion of extraterritorial jurisdiction. *Houghland Farms,* 119 Idaho at 75, 803 P.2d at 981. I.C. § 5–514

provides the basis needed for the courts of Idaho to assert extraterritorial jurisdiction over an individual or business. *Saint Alphonsus v. Washington,* 123 Idaho 739, 743, 852 P.2d 491, 495 (1993). "In order for an Idaho court to exert jurisdiction over an out-of-state defendant ... the act[s] giving rise to the cause must fall within the scope of our long-arm statute...." *Saint Alphonsus,* 123 Idaho at 742, 852 P.2d at 494. Mann has asserted that the Idaho courts have jurisdiction over Coonrod under one provision of Idaho's long-arm statute: I.C. § 5–514(a). Thus on appeal we are concerned only with whether there was sufficient evidence to support a conclusion that Coonrod transacted business within the state of Idaho so as to subject him to the jurisdiction of the district court.

I.C. § 5–514(a) provides in pertinent part as follows:

Any person, firm, company, association or corporation, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits said person, firm, company, association or corporation, and if any individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of said acts;

(a) The transaction of any business within this state which is hereby defined as the doing of any act for the purpose of realizing pecuniary benefit or accomplishing or attempting to accomplish, transact or enhance business purpose or objective or any part thereof of such person, firm, company, association or corporation; ....

For the purpose of the motion to dismiss it is important to note that Coonrod is being sued individually and thus we must examine his activities independently of those of High Country to determine if he was personally transacting business within Idaho for the purposes of the long-arm statute. While his acts may have been done to benefit the business in which he has an interest, it is never-

theless his actions with which we are concerned and not those of High Country.

Based upon the affidavits presented on the motion to dismiss we cannot say Coonrod transacted business within the state of Idaho within the meaning of the long-arm statute. The facts as alleged in Kent Mann's affidavit demonstrate only that Cannon and Coonrod were in daily contact regarding the operation of High Country; that Coonrod was involved in the financial decisions of High Country; and that Coonrod stated during a telephone call to him in Minnesota, which was initiated by Cannon in Utah, that he would guarantee payment for the calves. Therefore, the only actions alleged by Mann that would indicate Coonrod transacted business in Idaho are the telephone call and the fact that Mann is located in Idaho. We cannot say Coonrod transacted business in Idaho based upon a telephone call which he did not even initiate. Likewise, we cannot say Coonrod transacted business in Idaho due to the mere fact that Mann is located in Idaho. Nowhere do we find allegations supporting an inference that Coonrod was acting "for the purpose of realizing pecuniary benefit" or that he was "attempting to accomplish, transact or enhance" his own business purposes. Based upon the record before us there is simply no evidence that Coonrod entered into a transaction of business within the state of Idaho. These facts were not a sufficient basis upon which the district court could assert jurisdiction.

Because we hold that Coonrod did not transact business within Idaho so as to come within the scope of the Idaho long-arm statute, there is no need to discuss whether the exercise of jurisdiction would comply with the mandates of the United States Constitution.

Likewise, based upon our holding that Coonrod is not subject to the jurisdiction of the district court, there is no need for us to address whether the doctrine of equitable estoppel properly barred Coonrod from raising the defense of the statute of frauds.

## CONCLUSION

We hold that the district court erred in concluding it could properly exercise personal jurisdiction over Coonrod and we, therefore, reverse the denial of the motion to dismiss. Because the district court should not have exercised jurisdiction over Coonrod, the district court's judgment finding Coonrod jointly and severally liable under the sales contract is vacated and the case is remanded for entry of judgment against High Country alone. Costs but no fees awarded to appellant.

McDEVITT, C.J., and JOHNSON and SILAK, JJ., concur.

BISTLINE, Justice, dissenting.

The gist of the majority opinion leaves me unconvinced that the Court thereby obtains either a correct or just result. Justice Trout's opinion notes that the Manns assert the jurisdiction of Idaho courts over Coonrod under the provisions of I.C. § 5–514(a). Following that observation, Justice Trout states that "we are only concerned as to whether there was sufficient evidence to support a conclusion that Coonrod transacted business within the state of Idaho so as to submit Coonrod to the jurisdiction of the Idaho district court." *Id.*, 125 Idaho at 359, 870 P.2d at 1318. Having raised that question, the ensuing statement is to the importance of Coonrod's individual involvement, "and thus we must examine his [Coonrod's] activities independently of High Country to determine if he was personally transacting business within Idaho." Justice Trout goes on to say, "it is nevertheless his actions with which we are concerned and not those of High Country." *Id.* High Country Meats has not appealed from the judgment that was entered against it in district court.

The majority concludes that certain facts alleged in affidavits submitted in district court demonstrate only that Cannon and Coonrod were in daily contact regarding the operation of High Country, that Coonrod was involved in the financial decisions of High Country, that Coonrod stated during a telephone call ... that he guaranteed payment for the calves, and that actions alleged by Mann that showed Coonrod transacted busi-

ness in Idaho are the telephone call and the fact that Mann [and the veal calves produced by M & M Feedlot] were located in Idaho. The majority then goes on to state that it "cannot say Coonrod transacted business in Idaho based upon a telephone call which he did not even initiate" [1] or the fact that Mann is located in Idaho, and nowhere does the majority reach the obvious conclusion that Coonrod was attempting to realize a pecuniary benefit and enhance his own business purposes.

After conducting a detailed search of the record, clerk's transcript, and the briefs of the parties, it is perhaps the better approach to this controversy that the interested reader first be informed that neither Kent Mann nor Charles Mann, both residents of Parma, Idaho, and the co-owners of M & M Feedlot, instigated any discussions with Richard A. Coonrod; nor did they attempt to contact or seek out a Montana resident named Wells Cannon. It is clear from the reporter's transcript that the Manns were in the commercial enterprises of farming and running their cattle feedlot operation, in Canyon County, Idaho. The Manns, a father and son, had been so engaged in those operations for "probably twenty years altogether." Tr. 4–5. Asked at trial how he had come into contact with High Country Meats, Inc., Kent Mann's unrefuted answer was direct and short: *"They* approached us ... about growing veal for them." Tr. 5.[2] Additional testimony established that the Manns in the early part of

1990 started raising veal calves, and in the early spring the first four head of veal calves were delivered to High Country Meats—for which M & M was paid belatedly but in full. Tr. 5–6. Thereafter, M & M Feedlot was again contacted by High Country Meats wanting more of M & M's veal calves. Tr. 6.

Around the end of June or early in July 1990, M & M Feedlot was prepared to sell additional veal calves to High Country Meats, but first sought to obtain an understanding that High Country Meats would show more alacrity in making payment to M & M for the veal calves which M & M Feedlot would sell. At trial the defendants did not dispute that there was a telephone conference call involving three interested parties, namely, Wells Cannon of High Country Meats, a Utah corporation; Richard A. Coonrod, whose later-filed affidavit purported to show he was at that particular time a resident of Edina, Minnesota; and Kent Mann. Questioned as to who participated in that particular phone conversation, Kent Mann answered:

> A. The conversation was [with] a Wells Cannon who ran their operation in Utah, and a Mr. Richard Coonrod ... who financed the operation. He was in Minnesota at the time.

Tr. 7. A brief review of the transcript of the trial court proceedings discloses that Coonrod's personal guarantee in the course of the conference call to the Manns induced the

---

**1.** It matters not whether Coonrod did, or did not, initiate the telephone call, which was a conference call preceded by first ascertaining that those to be involved were alerted thereto. Coonrod, beyond any question, participated therein and expressed his guaranty that the Manns would receive payment.

Judge Doolittle correctly decided the controversy which came before him. Unfortunately, the mechanics of the judicial system are such that appellate judges can undo the good which a trial judge has accomplished. This controversy cannot help but remind one of a like fiasco which occurred not too long ago, *i.e., Clements Farms, Inc. v. Ben Fish & Son,* 120 Idaho 185, 814 P.2d 917 (1991). Therein another able trial judge, W.E. Smith, was likewise subjected to judge-bashing by the appellate system following a trial which concluded that a producer and ware-

houser were liable for breach of warranty of fitness. The Court of Appeals upheld the trial court, only to thereafter be rendered nugatory by a questionable decision by the Supreme Court, basically founded on the proposition that a disclaimer was effective because it was conspicuous, notwithstanding that it was set out in extremely fine print. The truly interested reader will find at 120 Idaho at 190, 814 P.2d at 922, the disclaimer which was utilized by the four person majority to reverse Judge Smith's trial court determination with directions to enter judgment in favor of Ben Fish & Son, all to the detriment of the local Clements Farms, Inc.

**2.** Kent Mann's testimony was in reference to Mr. Coonrod, and to High Country Meats, which is a Utah corporation.

Manns to sell their cattle to High Country. It is impossible for this Justice to read the testimony below and not conclude that those Justices comprising a majority have made a substantial error in judgment by succumbing to the "other opinion," which for the most part consists of being "unable to say" and reeks of absolute injustice heaped onto a district court judge who had found and declared the right result.

> THE COURT [Judge Doolittle]: You were the other person on the end of the telephone ... conversation here in Idaho?
>
> A. [Kent Mann]: Yes, sir.
>
> THE COURT: And it was a three-party conversation?
>
> A. [Kent Mann]: Yes, sir ... The conversation was initiated—the *telephone conference call was initiated by them* ... *And Mr. Coonrod said that he would guarantee payment of those cattle* if we would ship them to them.
>
> Q. [Mr. Schiller]: Would you have shipped the—the cattle without his assurance of payment?
>
> A. No, sir.
>
> Q. Okay, and did you believe Mr. Coonrod's assurances to be true?
>
> A. It's the only reason we sent them....
>
> . . . .
>
> Q. [W]ould you have let these calves go without his [Richard Coonrod] assurance of payment?
>
> A. No, sir.
>
> Q. Where were they [the calves] picked up?
>
> A. At the feedlot.
>
> Q. And that's where?
>
> A. Parma, Idaho.
>
> Q. [W]ho provided transportation?
>
> A. They did.
>
> Q. They did, High Country Meats?
>
> A. Yes, sir.

> Q. [H]ave you been paid for these loads of calves?
>
> A. We have had a partial payment.
>
> . . . .
>
> Q. Now, getting back to this phone conversation [the conference call] ... It was initiated by the defendants; correct?
>
> A. Yes.
>
> Q. [I]t was a conversation with you, and—and you were here in Canyon County, Idaho?
>
> A. Yes.
>
> Q. And you were the party to the conversation besides Mr. Cannon and Mr. Coonrod?
>
> A. Yes.
>
> Q. [A]nd Mr. Coonrod agreed to be responsible for the payment of these loads?
>
> A. Yes.
>
> Q. And did you and your father rely on—on those assurances?
>
> A. Yes.
>
> Q. [A]nd, again, were any of the cattle let go prior to the conversation?
>
> A. No.

Tr. 7–13. The record also shows that counsel for the Manns wrote a demand letter to Cannon and Coonrod on December 31, 1990, enclosing the invoices of purchase and payment and stating: "Payment of the purchase price on both of these sales was personally guaranteed by Richard A. Coonrod." R. 36.

On cross-examination, Kent Mann testified that, "Mr. Coonrod, or Mr. Cannon, called me and said that he would set up that conference call, and for me to be at my house at a specific time to accept—to take it." Tr. 17. Kent Mann testified that:

> The whole conversation was based on Mr. Coonrod's assurance that the cattle would be paid for.

Tr. 19 (emphasis added). The final testimony elicited by Mr. Nye on cross-examination was as follows:

Q. And you don't have a verbatim recollection, but it's your recollection 'if High Country doesn't pay,' is what Mr. Coonrod said?

A. That's my recollection.

Tr. 19.

On redirect examination, this further testimony was elicited by Mr. Schiller, counsel for the Manns and M & M Feedlot:

Q. Mr. Mann, is it not true that the conversation was to the extent that Coonrod was going to be the—the source of—of the funds to—to make these payments?

A. Yes.

Q. Okay, had he in the past been the source of—of funds for High Country Meats?

Tr. 19. An answer to that question was initiated, objected to, and Mr. Schiller rested plaintiffs' case. Mr. Nye asked the court "to take judicial notice of the affidavit of Mr. Coonrod that was filed on November 21st, 1991." Judge Doolittle queried, "In which he denies being a personal guarantor . . . on the grounds of lack of jurisdiction?" Tr. 20.

Based on the above proceedings, Judge Doolittle expressed his cogent view of Coonrod's motion to dismiss:

THE COURT: I have to presume that he is aware of the fact that my position is that *by engaging in a telephone conversation, which I now find under the testimony was initiated by either him [Coonrod], or someone else in the defendant corporation, but to include him [Coonrod]*.... And so *in order to induce an Idaho businessman to engage in—in an interstate commerce* [sic, transaction] *he* ... *promised to guarantee the payment for the cattle that were shipped.*

In my mind *that is clearly engaging in business within the State of Idaho* even though it is done by telephone.

And therefore it's my position that I have jurisdiction, and in the absence of his appearance, on any other issue being raised other than his affidavit of denial which is not subject to cross-examination, or anything else here because he has failed to appear here to testify; I take the testimony of the plaintiff who has appeared and testified as controlling.

Tr. 21–22.

That Coonrod had a monetary interest in High Country Meats, Inc., is established by his own subscribed and sworn-to affidavit dated November 21, 1991, and filed in the district court. Therein Coonrod states that he is a shareholder of High Country Meats, Inc., a Utah corporation. Coonrod also discloses therein that he has "loaned that corporation money from time to time as operating capital for the general operation of the business." R. 12. As to his further involvement in High Country Meats, his affidavit provides the naked assertion that he has "not personally guaranteed the contract obligation of, if any, of High Country Meats, Inc., with Kent Mann, Charles Mann or M & M Feedlot, and has not conducted activities of any kind in Idaho...." R. 12.

Beyond cavil, however, Coonrod was a participant in the three-party telephone conference call which was made *to* Kent Mann in Parma, Idaho, and during which conference call, according to the sworn testimony elicited in district court proceedings, reprinted above, Coonrod gave his personal *guaranty* to the Manns that they would receive payment for the veal calves. Since Coonrod undisputedly has loaned High Country its operating capital in the past, this Justice finds Kent Mann's testimony far more compelling than Coonrod's affidavit to the contrary. Clearly, Coonrod's guarantee cannot be described as anything other than "for the purpose of realizing pecuniary benefit," *i.e.*, a transaction that resulted in High Country's obtaining veal calves from M & M, obviously a marketable product. I.C. § 5–514(a).

A person with any kind of a conscience would not have perpetrated such a scheme, and would not now attempt to avoid its consequences. The Manns came to court, but Coonrod made no appearance in the court-

room where the question of his truthfulness could be decided. Staying physically out of Idaho, he nevertheless exercised his option to sign and file an affidavit, full-well knowing that it could not be subjected to cross-examination. Although Coonrod's physical person may have remained outside of Idaho, his telephonic presence in Idaho wherein he guaranteed payment to the Manns, for the purpose of inducing the Manns to release veal calves for shipment out of Idaho and into another state, was sufficient contact to hale him into any appropriate Idaho court.

The views of Judge Doolittle, rendered in denying Coonrod's motion to dismiss for lack of jurisdiction, are well-stated:

> Assuming that his promise of personal guarantee was made in a three-way telephone conversation which included the plaintiffs' participation from Idaho, and considering that the basic transaction was a business purchase from the Idaho feeder, the court believes that the contacts with Idaho were sufficient to give the Idaho court personal jurisdiction over the defendant, Richard A. Coonrod.

R. 18.

During oral argument of the appeal before this Court, Coonrod's counsel, Eric Rossman, and members of this Court engaged in the following discussion in which Mr. Rossman attempted to persuade this Court that Coonrod's personal due process rights would be violated by holding him accountable in an Idaho court for the promise he made to an Idaho businessman regarding Idaho cattle.

JUSTICE JOHNSON: There's no question that there was a purchase and sale of the calves between High Country and the Manns, M & M, and on the basis of the record on the motion to dismiss there's no question that there was a guarantee that related to that sale. How could we reasonably say that under the statute at least, *Mr. Coonrod* did not seek out the transaction of business in Idaho by *guaranteeing the payment* for that purchase?

MR. ROSSMAN: That's correct, Your Honor. There was the sale between High

Country Meats and M & M Feedlots, however what we're talking about today is the surety question.

JUSTICE JOHNSON: We're talking about Mr. Coonrod. His guarantee related to *that transaction which took place in the state of Idaho,* did it not?

MR. ROSSMAN. Yes.

JUSTICE JOHNSON: You haven't challenged jurisdiction over High Country?

MR. ROSSMAN: No, we have not.

JUSTICE JOHNSON: *There's no question about where the transaction took place and the guarantee related to the transaction.*

MR. ROSSMAN: That's correct, Your Honor.

. . . .

JUSTICE SILAK: Here you have an Idaho company, M & M, and *you have Idaho cattle being purchased and they're located in Idaho.*

MR. ROSSMAN: Well, this contract involves three different states, Your Honor. It involves Idaho, it involves Utah, and it involves Minnesota, and as I stated before, . . . he [Coonrod] didn't purposely direct anything at the state of Idaho, except the alleged guarantee over the phone. . . .

. . . .

CHIEF JUSTICE McDEVITT: This record, as I understand it, shows that M & M previously had sold calves to High Country, and this transaction was another transaction in a series of transactions in which High Country had participated. Had High Country suddenly become delinquent or slow pay after four calves were delivered and this [telephone] conversation took place, placed by your client's agent in Utah, to try to solve the problem of no further delivery of the contracted 62 head. *As a condition of the delivery in the transaction in Idaho, your client guaranteed payment for that delivery.* If I understand your argument, your client wouldn't even be subject to jurisdiction in Utah.

MR. ROSSMAN: When you say his [Coonrod's] agent in Utah, that's his corporate agent, yes, he's affiliated with him with High Country Meats. But we're talking about him in his individual capacity today. Today what we're concerned with is *his* personal due process rights. Mr. Cannon was not his personal agent in Utah, and second of all, what we're concerned with, we're not concerned with High County Meats on appeal today, we're concerned with Richard Coonrod and his due process rights. And so I submit that you should not look at High Country Meats prior negotiations or contact with the state of Idaho; that's not Richard Coonrod. He's the one whose due process rights we're concerned with here.... This individual, the only contact [with the state] ... was a three way conference call initiated in Utah, sent to my client in Minnesota, and that's what I submit justified the reversal on the personal jurisdiction issue and, on the statute of frauds issue, I submit that the conduct is not solely referable to the guarantee, its referable to the sale of the cattle and for that reason I respectfully request this Court reverse the lower court's decision.

(Emphasis added.)

Mr. Rossman's above argument is not in the least convincing to this one member of the Court. Clearly, Judge Doolittle was correct in his finding that M & M Feedlot was entitled to the entry of a judgment against High Country Meats, against Wells Cannon, and against Richard A. Coonrod, for the full amount of monetary damages to which the Manns and M & M Feedlot are justly entitled, and which have been withheld by each and every conspirator who connived to obtain possession of M & M veal calves and then transport them out of Idaho without paying, all contrary to Coonrod's guarantee that payment would be made. One need only ponder briefly to realize the extent of the substantial losses which the Manns in their small feedlot operation suffered while the conspirators were making off to another state with their ill-gotten gains.

Readily perceived here is a con game, or scam, whichever, having all of the markings of a criminal conspiracy to defraud, a matter which the consumer fraud division of the Idaho Attorney General's office should not hesitate to investigate. If a sufficient criminal case can be made that there was a conspiracy to defraud the Manns out of substantial sums of money, so much the better. Before this controversy is *to be fully resolved* by the Court, or, if it should be resolved by the office of the Attorney General, some thought should be extended toward assessing punitive damages against the perpetrators of what appears to be a clear case of obtaining M & M's veal calves under false pretenses.

In any event, it is the opinion of this Justice that the district court did not err in concluding that it could exercise personal jurisdiction over Coonrod and hold him jointly and severally liable with High Country Meats. Judge Doolittle's judgment should be affirmed in its entirety.